A94A2573. LAWTON v. GEORGIA TELEVISION COMPANY et al.
(456 SE2d 274)

ANDREWS, Judge.

This case arose from Georgia Television Company's (d/b/a WSB-TV) broadcast of a news series called "Dirty Little Secrets." That series centered around allegations that National Guard Lieutenant Colonel Julius Lawton, the Recruiting and Retention officer, sexually harassed female personnel.

The focus of the series, which was prepared and presented by Richard Belcher, a reporter and anchor for WSB, was the findings of an official National Guard investigation into the allegations of sexual harassment. That investigation consisted of a report, begun in May 1991 by Lieutenant Colonel Clyde Fulton, who was appointed by Brigadier General William Bland to investigate the allegations of harassment. The report contained over thirty witness statements gathered during a two-month investigation. The report concluded that Lawton engaged in sexual misconduct, including harassment. It found that Lawton had "sexually harassed, intimidated and caused subordinates mental stress through his misconduct. There is also evidence of sexual misconduct, that Ltc. Lawton has over the past four years indecently exposed himself on two occasions to two different sub-

ordinate employees and had a sexual encounter with SPC Sharon Thomas, a subordinate employee." It also stated that "[t]he effects of Ltc. Lawton's misconduct is a tragedy to the victims, to the black soldiers that saw him as a senior role model, and to the Georgia Army National Guard." The report recommended that Lawton "should be immediately reassigned from his supervisory position and other appropriate disciplinary action should be taken." It stated that "his discharge from the Army National Guard should not be honorable."

Although the report's conclusions were critical of Lawton, the thirteen-page report contained a lengthy discussion of one of the accuser's, Jackie James, psychiatric problems. The report states that James' psychiatric evaluation indicates that "[t]here was no evidence of delusions or hallucinations though perhaps her idea of a Major's sexual advances may be of a projection/delusional quality." The report notes that James' counseling sessions were "with a belief by others that the sexual harassment Sgt. James reported was not reality." Following the close of the investigation, in October 1991, Lawton was reprimanded for the alleged acts of misconduct.

WSB and its reporter, Belcher, subsequently acquired a copy of the report. On February 16, 1992, approximately six months after the Guard report was submitted, WSB aired "Dirty Little Secrets." The series examined the allegations of sexual harassment cited in the report and the Guard's failure to take appropriate action against Lawton despite the report's findings that the allegations had merit. Lawton declined Belcher's repeated attempts to obtain a statement from him.

Prompted by the series, the Guard ordered a "second look" into the allegations on February 25, 1992. On July 2, 1992, defendants reported that the Board of Officers charged with considering the charges had concluded that the allegations of sexual harassment against Lawton were baseless and had cleared him of the charges. A Guard spokesman stated that "the unanimous conclusion of the Board was that the allegations of harassment were really baseless." Belcher stated "I suppose the Board simply didn't believe the witnesses."

Lawton filed suit on February 9, 1993 against WSB, Belcher and Cox Enterprises for defamation and invasion of privacy. The complaint alleged that the broadcasts included the publication of false, malicious and defamatory statements about him, including accusations that he sexually harassed female members of the National Guard. Twice the court granted the defendants' motion for a more definite statement, ordering that Lawton specifically identify the statements and images upon which his complaint was based. In response, in amended complaints, Lawton referred the court to the videotapes and transcript of the broadcast.

WSB and Belcher filed a motion for summary judgment on the grounds that the broadcasts were privileged as fair and accurate reports of an official government record and the privacy claims were not actionable because they concerned a matter of legitimate public interest. The superior court granted the motion, determining that the fair report privilege rendered WSB and Belcher immune from liability for both defamation and privacy. The court compared the National Guard report with the transcript and videotapes of the broadcast and concluded the broadcast was privileged. This finding was based on the fact that the "gist and/or the sting" of the broadcast did not alter the report so as to convey an erroneous impression of Lawton. The superior court also concluded that the broadcast was privileged as to claims for invasion of privacy since the report concerned a matter of legitimate public interest.

1. In his first enumeration of error, Lawton claims that the superior court erred in determining as a matter of law that the defendants' broadcast constituted a fair and accurate report of the National Guard report, so as to fall within the "fair report privilege." Lawton claims that the broadcast aired only the portions of interviews which supported the claims of harassment and that it did not present the complete story. Lawton argues that through insinuation, fragmented reporting, omissions, selective airing of interviews, juxtapositions, and a pervasive "air of sarcasm," the overall impression created by the broadcast was unfair. He contends that Belcher showed material which enhanced the integrity of the victims, decreased his own credibility, and created an erroneous impression of the report.[1]

One example of the misrepresentations which Lawton cites is that the broadcast minimalized the extent of accuser James' psychiatric problems. Lawton argues that the broadcast implied that James' problems and her subsequent honorable discharge were caused by his actions and that these implications were not supported by the report. Lawton also argues that exculpatory information from the alleged victims contained in the report was not shown on the broadcast.

"For reasons of public policy the law recognizes that certain communications and publications should be accorded a privileged status. [Cit.] The privilege exists because it is more important that the public be informed about the privileged proceeding than it is for the defamed person to have legal recourse for the publication of the defamatory material. [Cit.] The public interest in being informed about public proceedings, public controversies, public officials, public fig-

---

[1] Because of the manner in which the issues are presented here, it is not necessary to address the issue of whether Lawton is a "public official." See generally *Stange v. Cox Enterprises*, 211 Ga. App. 731 (2) (440 SE2d 503) (1994); *Terrell v. Ga. Television Co.*, 215 Ga. App. 150 (449 SE2d 897) (1994).

ures, demands freedom of the press to report such events without assuming responsibility for what was said by the speaker." *McCracken v. Gainesville Tribune*, 146 Ga. App. 274, 275 (1) (246 SE2d 360) (1978); see generally OCGA § 51-5-7.

"It is usually conceded that there is a general rule that a qualified privilege attaches to proceedings of, and fair, impartial, and accurate news accounts of, administrative agencies of the government. Administrative proceedings by governmental agencies to discipline, remove from office, or revoke a license, are quasi-judicial in nature and are entitled, a[t] a minimum, to a qualified privilege." (Citations and punctuation omitted.) *Morton v. Stewart*, 153 Ga. App. 636, 639 (266 SE2d 230) (1980); see generally *Meyer v. Ledford*, 170 Ga. App. 245 (316 SE2d 804) (1984). Lawton does not argue that the National Guard report falls outside of this privilege, and thus concedes that, if otherwise fair and honest, the report is entitled to the conditional privileges afforded in OCGA § 51-5-7. See *Morton*, supra.

There is no allegation of actual malice in this matter, and the issue before us is simply whether the broadcast was a fair and honest representation of the National Guard report. " 'As long as the facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth.' " *Morton*, supra at 641; see also *Mathews v. Atlanta Newspapers*, 116 Ga. App. 337, 340 (4) (157 SE2d 300) (1967); *Atlanta Journal Co. v. Doyal*, 82 Ga. App. 321 (2), (3) (60 SE2d 802) (1950). The requirement is that the report be both impartial and accurate, that it be " 'neutral reportage.' " "We find no indication that the republisher has any burden except fairness, honesty, and accuracy." *McCracken*, supra at 276. " 'The report must present fully, fairly, and accurately an impartial account of the proceedings. Although it must be accurate, at least with regard to all material matters, a substantially accurate report may be privileged, as mere inaccuracies not affecting materially the purport of the article are immaterial. It is not necessary that the report be verbatim, and it may consist of an abridged or condensed statement, provided such statement is a fair one.' " *Shiver v. Valdosta Press*, 82 Ga. App. 406, 412 (61 SE2d 221) (1950).

The parties cite numerous federal cases involving the issue of "defamatory editing," including *Dorsey v. Nat. Enquirer*, 973 F2d 1431, 1438 (9th Cir. 1992); *Schiavone Constr. Co. v. Time, Inc.*, 619 FSupp. 684 (D.C.N.J. 1985); and *Dameron v. Washington Magazine*, 779 F2d 736, 739 (D.C. Cir. 1985), cert. denied, 476 U. S. 1141 (1986). Comment f to section 611 of Restatement of Torts (Second), frequently cited in cases involving this issue, provides: "The rule stated in this Section requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conform to that

precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings. Not only must the report be accurate, but it must [also] be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties." (Indentation omitted.) See *Schiavone*, supra at 699.

The "substantial accuracy" required for a "fair report" means that the fair report must have the same "gist" as the proceedings reported. See *Lavin v. New York News*, 757 F2d 1416 (3rd Cir. 1985).

In this matter, we have reviewed the broadcast, the transcript of the series and have compared it with the National Guard report. While the court recognizes that in certain situations the sensationalist "news" reporting of which Lawton complains may be actionable,[2] we nonetheless conclude that the superior court's grant of summary judgment in this case was proper.

As a matter of law, the broadcast was a "fair and honest" report of the National Guard report. The report on Lawton's behavior condemned, not exculpated him. The tone of the broadcast accurately depicted the tone of that report. The fact that exculpatory evidence was omitted from the broadcast is not dispositive since it was not required to devote equal time to Lawton's contentions. See *Mathews*, supra at 340. The requirement is that the presentation be "substantially accurate." *McCracken*, supra.

Though James' psychiatric history was not detailed in the broadcast, references were made to her psychiatric treatment. Further, although some of the report which was favorable to Lawton was omitted, there was also negative information about Lawton that was also omitted from the series.

The overall "gist" of the broadcast was that despite the negative report on Lawton's behavior, the Guard had failed to punish Lawton. The broadcast took the report's conclusions and focused on the delay

---

[2] See generally *Brewer v. Rogers*, 211 Ga. App. 343 (2) (a) (439 SE2d 77) (1993).

in the Guard's actions against Lawton. The Guard report admonished Lawton; the broadcast accurately depicted the tone of the report and followed it one step further.

In fact, as the series developed, the focus shifted away from Lawton. Belcher reported that the Guard had also failed to act with regard to alleged safety problems with Guard aircraft. Governor Miller expressed his concern over the Guard's failure to act on these matters. The actions under scrutiny were those of Lawton's superiors in the Guard, not the original allegations of harassment against Lawton.

2. Secondly, Lawton argues that the court erred in dismissing his claims for invasion of privacy on the basis that the Guard report was privileged as a matter of legitimate public interest. Lawton's argument is without merit.

Since the broadcast was privileged as to the defamation claims, it cannot be the subject of a claim for invasion of privacy. See *Rothstein v. L. F. Still & Co.*, 181 Ga. App. 113, 115 (2) (b) (351 SE2d 513) (1986).

*Judgment affirmed. Beasley, C. J., and Johnson, J., concur.*

DECIDED MARCH 17, 1995.

*Freeman & Hawkins, Robert U. Wright, Christine L. Mast, Crawford, Hinesley & Jennings, William F. Hinesley III*, for appellant.

*Dow, Lohnes & Albertson, Peter C. Canfield, Jeffrey C. Levy, Thomas M. Clyde*, for appellees.