**AIRTRAN AIRLINES, INC., Plaintiff,**

v.

**PLAIN DEALER PUBLISHING CO.,**
**doing business as the Plain**
**Dealer, Defendant.**

**No. 1:98–CV–1750–CAM.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 14, 1999.

Wayne Grant, L. Lin Wood, Jr., Kimberly W. Rabren, Wood & Grant, Atlanta, GA, for AirTran Airlines, Inc., plaintiff.

Peter Crane Canfield, Sean R. Smith, Cynthia L. Counts, Dow Lohnes & Albertson, Atlanta, GA, for Plain Dealer Pub. Co., defendant.

### ORDER

MOYE, Senior District Judge.

The above-styled action is before the court on 1) defendant's motion for summary judgment [# 27]; 2) plaintiff's motion to extend time to respond to defendant's motion for summary judgment [# 33]; 3) plaintiff's motion for leave to file supplemental brief [# 45]; 4) defendant's motion to stay discovery [# 29]; 5) defendant's motion for protective order [# 48]; 6) defendant's motion to dismiss [# 25–2]; and 7) plaintiff's motion to extend time for discovery [# 51].

### FACTS

Plaintiff AirTran Airlines, Inc. ("AirTran") operates a domestic airline. Prior to January 11, 1998, AirTran had operated as ValuJet Airlines, Inc. ("ValuJet"). In 1996, a ValuJet plane crashed into the Florida Everglades claiming 110 victims and leading to an ongoing FAA investigation and oversight of plaintiff. From October 20, 1997 to January 30, 1998, the Federal Aviation Administration ("FAA") conducted a National Aviation Safety Inspection Program ("NASIP") inspection of AirTran. The FAA drafted several documents during the course of the NASIP inspection.

On January 11, 1998, defendant The Plain Dealer published an article, which was prepared by Elizabeth A. Marchak (the "Article"). (Smith Declaration, Tab 1). The Article's headline read:

*New name, old problems for ValuJet*

FAA finds faults at AirTran
 Safety violations
continue to plague airline,
 documents show

FAA finds faulty repairs, other problems at AirTran

The Article consists of the following 22 paragraphs:

When FAA inspectors recently visited a contractor repainting several former ValuJet Airlines planes with the company's new red, teal and white paint scheme, they discovered that rudders used to steer the planes in flight had been improperly reinstalled.

Those inspectors found other serious safety violations concerning the airline, now called AirTran Airlines, including falsified documents, improper maintenance, faulty repairs and repeated failures to supervise contractors, according to internal Federal Aviation Administration documents obtained by The Plain Dealer.

The documents, based on a three-week inspection that ended Nov. 7, show the airline had a larger number of serious safety-related violations than a February 1996 report that recommended the airline be grounded. That warning went unheeded until after the May 11, 1996, crash of ValuJet Flight 592 in the Everglades claimed 110 lives.

After the crash, the FAA said the airline had lost control of its maintenance and the airline voluntarily grounded itself for four months until Sept. 30, 1996.

Last September, ValuJet changed its name and its paint scheme. It now serves 45 locations, including Akron–Canton Regional Airport.

Lori LeRoy, an AirTran spokeswoman, declined to discuss specific safety problems mentioned in the FAA documents, but said, "Informally, we understand that the outcome was excellent." She declined further comment.

The FAA documents include a preliminary draft of the agency's AirTran inspection report. The draft report mentions numerous safety problems that have been documented in at least four previous FAA inspections and one con-

ducted by the Defense Department. The draft report alleges:

√Three instances of failing to properly calculate the proper weight and balance of aircraft to determine safe takeoff and landing speeds.

√A senior pilot who oversees the qualifications of other pilots falsified information about the experience of an unspecified number of them.

√Failure to examine seven planes' transponders, which send out altitude and directional information to traffic controllers, after the planes received major overhauls.

√Improperly trained workers renovated an unspecified number of cabins to make way for larger business-class seats and modify the passengers' emergency oxygen system.

√Failure to have an FAA-required program to properly inspect fuel tanks for corrosion.

Margaret Gilligan, the FAA's deputy associate administrator for regulation and certification, said she could not comment until the final report is completed and its findings are validated.

"I think we do want to make it clear we are very mindful of the continuing interest by the public in aviation safety generally and in our continued oversight of AirTran," she said. "We are considering that as we continue to refine this inspection."

Refining the AirTran inspection apparently has provoked an internal dispute between the FAA team that performed the inspection and the Atlanta FAA office that oversees AirTran, sources familiar with the inspection say. Such inspections are widely accepted in the aviation industry as not only an evaluation of the airline, but also of the FAA office that routinely oversees it.

Another indication of an apparent internal dispute is the length of time it has taken for the AirTran report to be completed. Such reports usually are finalized within about 30 days and available to the public under the Freedom of Information Act.

Gilligan, however, downplayed the issue, describing it as a disagreement over the findings, and defended the agency's oversight. She said a second team was sent to reinspect the airline in late November and early December. She said both teams had been ordered to prepare the final report.

The FAA's AirTran inspections come 18 months after the agency promised Congress, families of those killed in the ValuJet crash and the flying public that it would change the way it oversees ValuJet and other emerging airlines. It vowed to better inspect airlines, better train its inspectors and better use its resources.

The agency's promises won support and praise in Congress, which added $758 million to the FAA's $8 billion budget to make improvements, including hiring 367 additional safety inspectors.

Concern about the FAA's recent inspection of AirTran has attracted the attention of Democratic Rep. Peter A. DeFazio of Oregon, who said Friday that he had asked FAA Administrator Jane Garvey for a full accounting of the airline's safety problems.

"They [FAA] are acting more to protect the industry or, in this case, one particular carrier than they are to fully inform the public of concerns that they have that the flying public would share," said DeFazio, a member of the House Transportation subcommittee on aviation, which conducted hearings in 1996 into the fatal crash.

And Republican Sens. John McCain of Arizona, chairman of the Commerce, Science and Transportation Committee, and Slade Gorton of Washington, chairman of the committee's aviation subcommittee, are scheduled to be briefed by the FAA tomorrow concerning the Air-

Tran inspection, according to a Senate official.

(Smith Declaration, Tab 1).

On June 22, 1998, plaintiff filed its complaint for libel. In its complaint, plaintiff alleged that the Article contained numerous false and defamatory statements which damaged plaintiff's business and business reputation by conveying to the public that plaintiff operated an unsafe airline. Plaintiff further alleged that the false and defamatory statements about plaintiff were negligently published by defendant and were published with actual malice.

## LEGAL DISCUSSION

### I. MOTION FOR SUMMARY JUDGMENT.

Rule 56 of the Federal Rules of Civil Procedure defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991).

In meeting this initial responsibility, for issues on which the movant would bear the burden of proof at trial, "that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Four Parcels of Real Property,* 941 F.2d at 1438 (citations and internal quotation marks omitted). For issues on which the non-movant would bear the burden of proof at trial,

the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim .... [T]he moving party simply may show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels of Real Property,* 941 F.2d at 1438 (citations, footnote and internal quotation marks omitted).

In determining whether the movant has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598. Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), "... and all justifiable inferences are to be drawn in his favor." *Everett v. Napper,* 833 F.2d 1507, 1510 (11th. Cir.1987). The movant's failure to meet this initial burden ends the inquiry and summary judgment should be denied.

However, once the initial burden has been met the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). *Accord, Four Parcels of Real Property,* 941 F.2d at 1437–38. Denials or allegations by the non-movant in the form of legal conclusions which are unsupported

by any specific facts have no probative value, and thus, are insufficient to create issues of material fact that would preclude summary judgment. *Broadway v. City of Montgomery,* 530 F.2d 657, 660 (5th Cir. 1976).[1] Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To avoid summary judgment on issues on which the movant would bear the burden of proof at trial, the non-movant "must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). For issues on which the non-movant would bear the burden of proof at trial and where the movant puts on evidence affirmatively negating the material fact, "the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* at 1116. Finally, for issues on which the non-movant would bear the burden of proof at trial and where the movant demonstrates an absence of evidence on the issue, the non-movant must respond either by "show[ing] that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, ... [or by] com[ing] forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17.

■ In its motion,[2] defendant contends that it is entitled to summary judgment because it was privileged to report, as part of an article concerning the FAA investigation of plaintiff, the details from a draft inspection report produced by government officials. In Georgia, the fair report privilege is set forth in O.C.G.A. § 51–5–7(5) which grants the privilege to "[f]air and honest reports of the proceedings of legislative or judicial bodies" and O.C.G.A. § 51–5–7(6) which grants the privilege to fair and honest reports of court proceedings.[3] The fair report privilege is intended to afford a measure of protection to a newspaper that republishes certain false and defamatory statements. "The defense of 'privilege' in a libel action is one of 'confession and avoidance.' It admits the publication of the allegedly defamatory matter but asserts it was done on a privileged occasion and bona fide in promotion of the object for which the privilege was granted." *Morton v. Gardner,* 155 Ga. App. 600, 604, 271 S.E.2d 733 (1980).

■ "[T]he publication of any statement by a newspaper made upon its own authority... is not privileged under the law which renders privileged a fair and honest report of court proceedings.... A publisher must not declare on his own authority the existence of facts which are only asserted in the proceedings. He is limited to reporting the fact of the assertion." *Wood v. Constitution Pub. Co.,* 57 Ga.App. 123, 131, 194 S.E. 760 (1937) (internal quote and cite omitted). And "[w]here the newspaper article is not a fair and honest report of the court proceedings purported to be reported in the article, its publication is not privileged." *Id.* at 133, 194 S.E. 760. The report must be fair and dispassionate and the publisher must add nothing of its own. *Augusta Chronicle Pub. Co. v. Arrington,* 42 Ga.App. 746, 749, 157 S.E. 394 (1931). To be protected by the privilege, the facts must not be misstated, distorted or arranged so as to con-

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

2. Because defendant filed its motion for summary judgment and its motion to stay discovery on the day that the discovery period commenced in this case, there has been virtually no discovery.

3. As will be discussed more fully below, O.C.G.A. § 51–5–7(4) sets forth a conditional privilege in connection with the anti-SLAPP statute found at O.C.G.A. § 9–11–11.1.

vey a false or defamatory meaning. *Mathews v. Atlanta Newspapers, Inc.*, 116 Ga. App. 337, 340, 157 S.E.2d 300 (1967).

Defendant asserts that the Article was privileged as a fair and accurate report of an official government document. The sole evidence submitted by defendant in support of its summary judgment motion is a copy of "Draft 2, Department of Transportation, Federal Aviation Administration, Flight Standards Division, National Aviation Safety Inspection Program, Inspection Report" as the "preliminary draft" referenced in the Article (the "Draft Inspection Report"). (Smith Declaration, Tab 2). This copy is attached to the unsworn Declaration of Sean R. Smith, one of the attorneys of record for defendant.

As defendant explains, the Article stated as the source of its information "internal Federal Aviation Administration documents obtained by The Plain Dealer." The Article further specified that these documents were "based on a three-week inspection that ended Nov. 7 ... [and] include a preliminary draft of the agency's AirTran inspection report." In its Responses to Mandatory Disclosures, defendant listed the Draft Inspection Report as the "preliminary draft" to which the Article referred. Hence, defendant insists that this shows that the Article was based solely on the Draft Inspection Report and that the Article was a fair and honest report of the contents of this document. The court disagrees.

As plaintiff correctly points out, defendant has failed to present any admissible, competent evidence identifying and submitting the documents or reports to which the Article allegedly referred. As set forth above, the Article referred to not just the "preliminary draft" but to "documents" that included the "preliminary draft". The Article does not specifically identify the "preliminary draft" or the other "documents". The Article also referred to "a February 1996 report that recommended the airline be grounded" and "four previous FAA inspections and one conducted by the Defense Department." Defendant has not properly submitted any of the documents that are referred to in the Article. Without all the underlying documents, the court cannot determine whether the Article constitutes a fair and honest reporting of the contents of those documents.

The sole document that defendant did produce, the Draft Inspection Report, is uncertified and unauthenticated. As plaintiff correctly points out, Smith's unsworn declaration to which this document is attached is not a proper affidavit for purposes of Fed.R.Civ.P. 56(e) because it was not "made on personal knowledge, ... [it does not] set forth such facts as would be admissible in evidence, and ... [it does not] show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). *See CMS Industries, Inc. v. L.P.S. International, Ltd.*, 643 F.2d 289 (5th Cir.1981).

In considering defendant's motion for summary judgment, the "court may consider only that evidence that would be admissible at trial." *Sires v. Luke*, 544 F.Supp. 1155, 1160 (S.D.Ga.1982); *Property Management & Investments, Inc. v. Lewis*, 752 F.2d 599, 604 n. 4 (11th Cir. 1985). The court may consider evidence so long as they are reducible to admissible form at trial. *McMillian v. Johnson*, 88 F.3d 1573, 1583–85 (11th Cir.1996), *aff'd* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). For example, an affidavit may properly point to the testimony of another witness or to a source of competent evidence available at trial. *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 37–38 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

■ Plaintiff's objections to this court's consideration of the Draft Inspection Report in ruling upon defendant's summary judgment motion are well taken. The Draft Inspection Report is not sworn to, certified or attached to an affidavit signed by an individual shown to be competent to authenticate the document and defendant has offered no evidence authenticating the Draft Inspection Report as an official FAA

document. The Article referenced several FAA and non-FAA documents. By way of illustrating the existence of other FAA documents, plaintiff has submitted a certified copy of the Department of Transportation, Federal Aviation Administration, Flight Standards Division, National Aviation Safety Inspection Program Inspection Report and Follow–Up Action (the "Final Inspection Report").

It is not disputed that the Final Inspection Report found no significant issues in the inspection of plaintiff that would have a direct impact on safety, no evidence of fraudulent activities by plaintiff or its employees, no indication of improperly trained or unqualified flight crew members and no evidence of plaintiff's aircraft operating in an unsafe condition. It cannot be disputed, however, that defendant could not have had this information when it published the Article because the Final Inspection Report was issued on or about February 26, 1998, after the completion of the follow-up investigation on January 30, 1998, well after the publication of the Article on January 11, 1998. In fact, on March 29, 1998, defendant published a follow-up article prepared by Marchak which stated in relevant part: "The FAA's [spokeswoman Kathryn] Creedy said the final report for the November inspection shows that the airline is safe. 'If we had found a significant safety issue,' she said, 'we would have had no hesitancy to ground them, period.'" Marchak, *ValuJet monitoring inadequate, review says*, The Plain Dealer, March 29, 1998 at A–1, A–15.[4]

Defendant then contends that the duly certified and authenticated copy of the Final Inspection Report submitted by plaintiff authenticates the Draft Inspection Report. The Final Inspection Report explains in its "Introduction":

The intention of this report is to provide an understanding of:

1. The findings of a [NASIP] team at ValuJet/AirTran Airlines during a scheduled inspection during October 13 through November 7, 1997,

2. The results of the follow up investigation to these findings conducted by the ValuJet/AirTran Airlines Certificate management Team in the Atlanta Flight Standards District Office, and

3. A summary of the dispositions of each finding, including the specific corrective action and the initiation of regulatory enforcement investigations where such action was necessary.

It should be noted that NASIP team members are generally selected from diverse assignments with various air carriers and do not have [a] detailed knowledge of the distinct operations of the specific airline they are inspecting. Thus, the initial findings are frequently modified with reference to information obtained from the initial debriefing of the Certificated Holding District Office (CHDO) and during the follow-up investigations. Historically, initial NASIP findings reports often express potential or possible concerns raised within the time-compressed period of the NASIP inspection and are revised substantially upon further investigation and analysis of the specific issues. Additionally, the FAA's customary practice has been to release the initial NASIP findings report soon after the inspection and then publish the subsequent in-depth investigative report as a separate document.

4. In addition, an article published in The Atlanta Journal–Constitution on November 12, 1998 concluded:

AirTran's safety record doesn't appear to be glaring, notwithstanding the recent accident in which one of its jets ran off a Hartsfield runaway after an emergency landing prompted by hydraulic problems. Prior to that, AirTran/ValuJet's only acci-

dent since late 1996 came last spring when a jet flew through hail over North Georgia and made a forced landing.... (During the same time frame Delta had 24 safety incidents, ranging from very minor to serious, according to the National Transportation Safety Board database on the Internet.). Thurston, Not Out of the Clouds, Atlanta Journal–Constitution, Nov. 12, 1998 at G–1, G–5.

However, to facilitate a thorough understanding of the safety and compliance issues affecting ValuJet/AirTran Airlines, both the initial NASIP team's findings and the results of the CHDO's subsequent follow up actions have been combined as a single report. This comprehensive effort affords the detached context to examine all of the initial NASIP findings through to their investigative conclusions without creating an inaccurate assumption. The FAA has decided to utilize this format in future NASIP reports.

Of note, a number of findings have resulted in enforcement actions. These are identified by the EIR numbers listed in their respective Corrective Actions. A few of the findings have resulted in more lengthy investigations and corrective actions than could be completed in the time allotted for this report. Therefore, some of these actions have not yet been closed. These issues will be addressed in separate correspondence following their completions.

(Final Inspection Report at "Introduction"). Accordingly, the Final Inspection Report incorporates the Draft Inspection Report. A thorough comparison of the Final Inspection Report and the Draft Inspection Report reveals that the Draft Inspection Report is reprinted, virtually in its entirety word for word, in the Final Inspection Report. For example, in the first of the two sections of the "Executive Summary" of the Final Inspection Report, the "Executive Summary" of the Draft Inspection Report is reprinted in its entirety as follows:

In accordance with the [NASIP], a team of Aviation Safety Inspectors conducted an inspection of ValuJet Airlines, d.b.a. AirTran Airlines, from October 20 through November 7, 1997. The areas inspected are listed in the Table of Contents of this report. All reference to ValuJet Airlines, Inc. in this report will be AirTRAN Airlines.

AirTRAN Airlines corporate headquarters is located at 1800 Phoenix Blvd., Suite 126, Atlanta, Georgia. AirTRAN Airlines provides scheduled domestic air carrier passenger service from Atlanta, GA, to 12 states operating 31 McDonnell Douglas DC–9–32 type aircraft. The company employs approximately 2403 personnel and has its main maintenance and crew bases in Atlanta, GA with contract maintenance facilities in Macon, GA and Lake City, FL.

Findings documented during this inspection that are being investigated for possible non-compliance with Title 14 of the Code of Federal Regulations (CFR) are: Operations training manual, operations manual and operations training records. Additionally, the maintenance department findings for non-compliance with Title 14 of the Code of Federal Regulations are: Airworthiness Directives compliance and maintenance spot inspections.

AirTRAN Airlines was found to have deviated from its approved or accepted procedures in the areas of contractual arrangements, MEL/deferred maintenance, maintenance inspection system and Required Inspection items, operations training and crew qualifications. Compliance issues raised during this inspection were discussed with company personnel and the Principal Inspectors. Those issues that could not be satisfactorily resolved, became findings in the body of the report. In the case of findings where enforcement action is anticipated, physical evidence has been provided to the certificate holding district office (CHDO).

The team would like to thank both AirTRAN Airlines and the Certificate Management Unit (CMU) for their cooperation and support given the team during the inspection. The assistance and preparations made by AirTRAN Airlines was a contributing factor to the inspection being completed on schedule.

(Draft Inspection Report at "Executive Summary"). The specific findings made by the team of Aviation Safety Inspectors from October 20 through November 7 are

then listed in detail throughout some 60 pages of the Draft Inspection Report and also are listed almost verbatim throughout some 90 pages of the Final Inspection Report together with the results of the follow-up investigations.

The court is not unconvinced that the Draft Inspection Report is what it purports to be [5] or that it may be authenticated at trial, if necessary. Even assuming that the Draft Inspection Report is authentic, however, this authentication does not prove that this is the "preliminary draft" to which the Article [6] referred or that this is the only document upon which the Article relied.[7] Defendant has not supported its motion with any admissible evidence from any individual involved in writing the Article or claiming to possess first-hand knowledge of the documents and reports to which the Article referred. Defendant has failed to carry its burden of showing that the Article was privileged.[8]

Even assuming arguendo that the Draft Inspection Report is the "preliminary draft" to which the Article refers, the court is far from being able to conclude that, as a matter of law, the Article was an honest and fair report of an "official document". Plaintiff argues, among other things, that the Draft Inspection Report was an "unofficial", "non-public" document which was "improperly leaked" to defendant prior to the issuance of the official NASIP report. Defendant has offered no admissible evidence to pierce these allegations. The "Introduction" to the Final Inspection Report is somewhat enlightening on this point:

> [T]he FAA's customary practice has been to release the initial NASIP findings report soon after the inspection and then publish the subsequent in-depth investigative report as a separate document. However, to facilitate a thorough understanding of the safety and compliance issues affecting ValuJet/AirTran Airlines, both the initial NASIP team's findings and the results of the CHDO's subsequent follow up actions have been combined as a single report. This comprehensive effort affords the detached context to examine all of the initial NASIP findings through to their investigative conclusions without creating an inaccurate assumption.

This appears to imply that the FAA had made an extraordinary effort in connection with AirTran's inspection to not publish the initial findings.[9] Clearly, the FAA was

---

**5.** The court notes that plaintiff does not specifically question the genuineness or the accuracy of the Draft Inspection Report. Plaintiff admits that the FAA had made initial findings after its preliminary investigation of plaintiff.

**6.** Smith cannot swear under oath that the Draft Inspection Report was the "preliminary draft" referred to in the Article.

**7.** In fact, the evidence of record is to the contrary. For example, the Article contained the statements that the Draft Inspection Report mentioned "numerous safety problems that have been documented in at least four previous FAA inspections and one conducted by the Defense Department," and that "documents" showed that plaintiff "had larger number of serious safety-related violations than a February 1996 report that recommended the airline be grounded." These statements do not appear in the Draft Inspection Report.

**8.** The necessity for evidential clarity is highlighted by the rampant confusion regarding the identity of documents in this case. For example, in Attachment C to its Responses to Mandatory Disclosures, defendant listed three drafts (i.e., "Draft–1", "Draft–2" and "Draft–3") of NASIP inspection reports allegedly relevant to this case. Pursuant to LR 26.1D(7), Attachment C requires that defendant list all documents in its "possession, custody, or control that are relevant to disputed facts alleged with particularity in the pleadings." In its response to the production requests, however, defendant informed plaintiff that it did not possess any document with the title, "Draft–1" or any document purporting to be "Draft–1". (Wood Aff., ¶¶ 8, 9). Defendant further produced a document similar to the Final Inspection Report as "Draft–3" even though it does not bear any such title or designation. (Id. at ¶ 11).

**9.** In this regard, the court notes that defendant has not submitted a FAA-certified copy of the Draft Inspection Report.

concerned about the possibility of "creating an inaccurate assumption" from the initial findings. The record in this case does not indicate how defendant obtained the Draft Inspection Report and whether it was available to the public at the time it was obtained by defendant.

The "Introduction" to the Final Inspection Report also contains the following warning:

It should be noted that NASIP team members are generally selected from diverse assignments with various air carriers and do not have [a] detailed knowledge of the distinct operations of the specific airline they are inspecting. Thus, the initial findings are frequently modified with reference to information obtained from the initial debriefing of the Certificated Holding District Office (CHDO) and during the follow-up investigations. Historically, initial NASIP findings reports often express potential or possible concerns raised within the time-compressed period of the NASIP inspection and are revised substantially upon further investigation and analysis of the specific issues.

Unquestionably, defendant did not have the benefit of this express warning before it published the Article. Plaintiff argues, however, that defendant should have known the questionable validity of the preliminary findings from Margaret Gilligan, the FAA's deputy associate administrator for regulation and certification, who told defendant that "she could not comment until the final report is completed and its findings are validated."

In addition, it is not difficult to imagine defendant, as an experienced publisher of a newspaper, might have had previous occasions to publish an article on other FAA inspection reports; draft or final. It would not be entirely far-fetched to imagine that, from such experience, defendant could have gathered this "historical" knowledge that "initial NASIP findings reports often express potential or possible

concerns . . . and are revised substantially upon further investigation and analysis." Since there has been no discovery in this case, the facts have not been developed.

 Pretermitting the issue of whether an improperly leaked, preliminary, unofficial, non-public draft of unidentified FAA documents is the type of official document contemplated by the fair report privilege, at the least, such facts, if true, would certainly go to defendant's motive in publishing the Article and the fairness and accuracy of the Article.[10] The fair report privilege is a conditional privilege, not an absolute privilege. *Morton v. Stewart*, 153 Ga.App. 636, 638, 266 S.E.2d 230 (1980). The fair report privilege must be construed together with O.C.G.A. § 51–5–9 which states, "[i]n every case of privileged communications, if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action." On this point, this court adopts the holding in *Schafer v. Time, Inc.*, 1994 WL 720256, 22 Med.L.Rptr. 2117 (N.D.Ga. 1994):

All of the privileges contained in O.C.G.A. § 51–5–7 are conditional, rather than absolute, and may be lost upon a showing by the plaintiff of "actual malice". Thus, if plaintiff were to present evidence tending to show that defendant published the Article with "actual malice", as that term has been defined in First Amendment law, defendant would not be entitled to summary judgment, as dispute would exist with respect to a material fact.

*Id.* at 2119, 1994 WL 720256 (cites omitted). The questions of whether the Article is privileged as a fair report and whether the privilege, if applicable, is lost due to actual malice are generally questions of fact for the jury. *Lamb v. Fedderwitz*, 71 Ga.App. 249, 30 S.E.2d 436 (1944). Because defendant in this case has offered no

**10.** For example, if defendant knew the questionable validity of the preliminary findings, it should have been clearly conveyed to the readers as to not mislead them.

evidence in support of its summary judgment motion to pierce plaintiff's allegations of actual malice and plaintiff has been unable to conduct discovery in this regard, summary judgment is premature at this juncture.

Defendant adamantly insists that simply comparing the Draft Inspection Report and the Article proves that the Article is a fair and honest report of the Draft Inspection Report. The court cannot agree. According to the Draft Inspection Report, the Aviation Safety Inspectors investigated whether plaintiff violated federal regulations dealing with air safety during the period of October 20, 1997 to November 7, 1997 pursuant to the FAA's NASIP and reported compliance issues that could not be satisfactorily resolved. As summarized in the "Executive Summary" and set forth in detail in the body of the Draft Inspection Report, the Inspectors found numerous violations. The Inspectors' findings from the preliminary investigations are also summarized in the "Executive Summary" of the Final Inspection Report:

This report addresses the 106 findings from the Draft 3 NASIP report,[11] provided to the Atlanta FSDO on November 26, 1997. The report is divided into two sections titled Operations (34 findings) and Airworthiness (72 findings). Each finding is followed by a corrective action describing the action taken by the Atlanta FSDO and AirTran Airlines.

Each of the 106 findings were fully investigated by the Atlanta FSDO. In addition to the work accomplished by the Atlanta FSDO, the office received assistance from an independent review and analysis team, an independent consulting team of inspectors, CSET team members and ASO–290.

Of the 106 findings, the Atlanta FSDO did not find evidence to substantiate 60 findings (18 Operations and 42 Airworthiness). The Atlanta FSDO initiated Enforcement Investigative Reports for 25 of the findings. All findings that were substantiated by the FSDO have either been corrected by the airline or corrective action is in progress and will be tracked by the Atlanta FSDO with the use of an action plan for closure. Future close out actions will be recorded in the Program Tracking and Reporting System (PTRS).

The Atlanta FSDO found no significant issues that would have a direct impact on safety, or systemic failures with AirTran Airlines. We found no evidence of fraudulent activities. In addition, there was no indication of improperly trained or unqualified flight crew members nor aircraft operating in an unsafe condition. This conclusion was validated by an independent review and analysis team of senior inspectors.

(Final Inspection Report at "Executive Summary").

It is true that each of the specific allegations of violations re-published in the first paragraph, second paragraph and five check marked paragraphs of the Article can be found in the Draft Inspection Report. However, the issue in this case is not whether the FAA at some point in time during the October 20, 1997 to January 30, 1998 inspection of plaintiff made initial findings of violations — it did. The crucial issue is whether the FAA at any time during the inspection determined that plaintiff was guilty of serious safety violations as asserted in the Article. Plaintiff submits that it did not.

■ To be protected as a "fair report", the report must have the same "gist" as the proceedings reported. *See Brown and Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir.1983); *Lavin v. New York News, Inc.*, 757 F.2d 1416 (3rd Cir. 1985), cited in *Lawton v. Georgia Television Co.*, 216 Ga.App. 768, 772, 456 S.E.2d 274 (1995). To be protected, the report

---

**11.** The court notes that the Final Inspection Report apparently used "Draft 3", not "Draft 2", which was submitted by defendant as the Draft Inspection Report. In addition, defendant is apparently referring to a document very similar to the Final Inspection Report as "Draft 3".

must be substantially accurate. *Shiver v. Valdosta Press*, 82 Ga.App. 406, 412, 61 S.E.2d 221 (1950). "The reporter is not privileged under this section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties." *Lawton*, 216 Ga.App. at 772, 456 S.E.2d 274, referencing *Schiavone Construction Co. v. Time, Inc.*, 619 F.Supp. 684, 699 (D.N.J. 1985). "The law does not accord any privilege to newspapers to interpolate obnoxious opinions in the report of judicial or other proceedings nor to the addition of inflammatory headlines by way of introduction thereto." *Shiver*, 82 Ga.App. at 413, 61 S.E.2d 221.

The Article did not merely report the findings as contained in the Draft Inspection Report. The Article did not simply state that the preliminary investigation had found 106 violations. The Article concluded, among other things, that these violations constituted "serious safety violations". The following statements in the Article are not found in the Draft Inspection Report: 1) that the violations are "old problems for ValuJet"; 2) that "[s]afety violations continue to plague [plaintiff]"; 3) that the "inspectors found other serious safety violations concerning the airline"; 4) that "the airline had a larger number of serious safety-related violations than a February 1996 report that recommended the airline be grounded"; and 5) that "numerous safety problems [are those] that have been documented in at least four previous FAA inspections and one conducted by the Defense Department."

In addition, the bold-lettered headline of the Article on the front page states: "*New name, old problems for ValuJet* FAA finds faults at AirTran/Safety violations continue to plague airline, documents show/FAA finds faults at AirTran." The Article also states as fact that "Lori LeRoy, an Air-Tran spokeswoman, declined to discuss specific safety problems mentioned in the FAA documents." Taking all of this together, the Article could have conveyed to

the public that the FAA had concluded that plaintiff operated an unsafe airline. The Article unquestionably conveys to the reader that plaintiff had safety problems greater in number than those alleged to have been contained in a February 1996 report recommending that the airline be grounded a couple of months before the airline suffered a tragic crash in May of 1996, and that plaintiff had failed to correct these alleged safety problems despite the fact that they had been mentioned and brought to its attention in at least five previous inspections. Plaintiff asserts that the sting of the Article conveyed to the public that plaintiff knowingly operated an unsafe airline which was ripe for another crash.

In retrospect, defendant's assumption that the preliminary findings of numerous violations equated to the FAA's finding of "serious safety violations" was clearly erroneous. As the Final Inspection Report states, the preliminary findings were "express[ions of] potential or possible concerns." However, defendant has not offered sufficient evidence to establish that its assumption was factually supportable, accurate or reasonable even at the time of the Article's publication. Defendant argues that for it not to characterize such numerous violations of the federal safety regulations as "serious" would "fly in the face of common sense." Defendant further argues that the Article is substantially accurate because an exact reprinting of the Draft Inspection Report in the defendant newspaper would produce the same effect on the mind of the reader as did the article as published. These are questions for the jury. *See Mathews*, 116 Ga.App. at 339, 157 S.E.2d 300 (holding that "[t]he general rule [is] that the effect of the article on the reading public and whether or not it tends to bring the petitioner into hatred, contempt or ridicule are issues of fact for the jury.").

Moreover, plaintiff submits that discovery will reveal that defendant ignored well-known or readily accessible information

establishing that initial NASIP findings or even revised NASIP findings do not necessarily constitute "serious safety violations" by an airline and that defendant ignored available information [12] supporting the conclusion that the forthcoming Final Inspection Report would confirm that plaintiff in fact operated a safe airline. Thus, further discovery is necessary.

The court is mindful of its duty to protect and enforce First Amendment rights. Such rights, however, are not unlimited:

> By and large a great part of the American public depends upon the press to keep it abreast of the news. Therefore it continues to be of paramount importance that the press remain free — undeterred and unfettered in the performance of this tremendous task. It is equally important however that a free press be a responsible press, as declared and contemplated in Article 1, Section 1, Paragraph 15, of the Constitution of Georgia. A 'free press' and a 'responsible press' are, and should be synonymous terms. Liberty of the press is not synonymous with license, nor does it give the press any right or license to publish libelous matter without responsibility to those who are innocent victims of such libelous publication. Freedom of the press gives the right to print the truth and to comment fairly about the truth; freedom of the press does not give a license to print untruths or half-truths, which are equivalent to untruths and which, in their effect on a person's character and reputation are often more damaging and devastating than would be an outright falsehood.

*Davis v. Macon Telegraph Publishing Co.*, 93 Ga.App. 633, 640–41, 92 S.E.2d 619 (1956). Especially in light of the tragic crash in May of 1996, the results of the FAA inspection of plaintiff were undoubtedly matters of great public importance: The public had a right and need to know. By the same token, however, because of the unfortunate crash, ideally, the responsible press would have been especially cautious as to not inflame the already predisposed public.

Because genuine issues of facts remain as set forth above, the court hereby DENIES defendant's motion for summary judgment.

## II. *MOTION FOR EXTENSION OF TIME TO RESPOND.*

In light of the above ruling denying defendant's motion for summary judgment, plaintiff's motion for extension of time to respond to defendant's summary judgment motion is DENIED as MOOT.

## III. *MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF.*

To insure that the facts and issues are adequately presented, the court hereby GRANTS plaintiff's motion for leave to file supplemental brief in opposition to defendant's motion for summary judgment. The court has also considered defendant's response brief to plaintiff's supplemental brief.

## IV. *MOTION TO STAY DISCOVERY.*

In light of the above ruling, the court hereby DENIES this motion as MOOT.

## V. *MOTION FOR PROTECTIVE ORDER.*

In light of the above rulings, the court hereby DENIES as MOOT defendant's request to stay depositions pending disposition of the above motions.

## VI. *MOTION TO DISMISS.*

Defendant moves this court for sanctions and to dismiss the complaint because plaintiff allegedly verified its complaint in violation of O.C.G.A. § 9–11–11.1, an "anti-SLAPP" statute "designed to prevent

---

12. Plaintiff points out that, because "Draft–3" produced by defendant is very similar in content to the Final Inspection Report, discovery must be conducted to determine when defendant received "Draft–3" or learned of any of its contents since it directly contradicts the Article.

'Strategic Litigation Against Public participation.'" *Providence Construction Company v. Bauer,* 229 Ga.App. 679, 494 S.E.2d 527 (1997). The relevant Code section provides:

> For any claim asserted against a person or entity arising from an act by that person or entity which could reasonably be construed as an act in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, both the party asserting the claim and the party's attorney of record, if any, shall be required to file, contemporaneously with the pleading containing the claim, a written verification under oath.... Such written verification shall certify that the party and his or her attorney or record, if any, have read the claim; that to the best of their knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; that the act forming the basis for the claim is not a privileged communication under paragraph (4) of Code Section 51–5–7; and that the claim is not interposed for any improper purpose such as to suppress a person's or entity's right of free speech or right to petition government, or to harass, or to cause unnecessary delay or needless increase in the cost of litigation.... If a claim is verified in violation of this Code section, the court, upon motion or upon its own initiative, shall impose upon the persons who signed the verification, a represented party, or both an appropriate sanction which may include dismissal of the claim and an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, including a reasonable attorney's fee.

O.C.G.A. § 9–11–11.1(b). More specifically, defendant alleges that plaintiff improperly verified the claim even though it knew that the Article is a privileged communication made in connection with an FAA investigation of plaintiff pursuant to O.C.G.A. § 51–5–7(4). That Code section defines privileged communication as:

> Statements made in good faith as part of an act in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in subsection (c) of Code Section 9–11–11.1.[13]

Assuming without deciding that this statute applies to libel claims against newspaper defendants and to federal diversity actions, and assuming arguendo that plaintiff's complaint arises from an act in furtherance of the right of free speech in connection with an issue of public interest and concern, defendant nevertheless cannot establish as a matter of law that such an act was conducted by defendant in "good faith" as required by O.C.G.A. § 51–5–7(4).

The court rejects defendant's contention that, because the Article was written in connection with the FAA's inspection and was allegedly based on an FAA report, it was necessarily privileged. Defendant does not assert that plaintiff's complaint fails to state a claim upon which relief could be granted. As set forth in detail above, defendant has presented no evidence establishing that its reporting is privileged as a matter of law. Moreover, there is no indication of abusive litigation on the part of plaintiff.

13. O.C.G.A. § 9–11–11.1(c) provides that the protected act "includes any written or oral statement, writing, or petition made before or to a legislative, executive, or judicial proceedings, or any other official proceeding authorized by law, or any written or oral statement, writing, or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."

Even assuming arguendo that defendant is entitled to assert the privilege afforded by O.C.G.A. § 51–5–7(4), the privilege is only a conditional privilege. *Atlanta Journal Co. v. Doyal,* 82 Ga.App. 321, 60 S.E.2d 802 (1950). Generally, the question of whether a communication is privileged is a jury question and general conclusory assertions by a defendant that statements it published were published in good faith is insufficient to meet defendant's burden of showing the statements were privileged as a matter of law. *Kennedy v. Johnson,* 205 Ga.App. 220, 223, 421 S.E.2d 746 (1992).

Therefore, the court hereby DENIES defendant's motion for dismissal and for sanctions.

### VII. *MOTION FOR EXTENSION OF DISCOVERY.*

For the reasons set forth above in connection with ruling on defendant's motion for summary judgment, the court hereby GRANTS plaintiff's motion for extension of discovery. The parties may commence discovery in this case as of the date of the entry of this order in accordance with Fed. R.Civ.P. and LR 26.3.

### *CONCLUSION*

Therefore, the court hereby 1) DENIES defendant's motion for summary judgment [# 27]; 2) DENIES as MOOT plaintiff's motion to extend time to respond to defendant's motion for summary judgment [# 33]; 3) GRANTS plaintiff's motion for leave to file supplemental brief [# 45]; 4) DENIES as MOOT defendant's motion to stay discovery [# 29]; 5) DENIES as MOOT defendant's motion for protective order [# 48]; 6) DENIES defendant's motion to dismiss [# 25–2]; and 7) GRANTS plaintiff's motion to extend time for discovery [# 51].