993 A.2d 778

THOMAS JOHN SALZANO, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. NORTH JERSEY MEDIA GROUP INC., D/B/A THE RECORD, NORTHJERSEY.COM, MALCOLM BORG, STEPHEN A. BORG, MARTHA MCKAY, AND JONATHAN MARKEY, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS, AND GLEN RIDGE VOICE, INC. AND FRANK A. ORECHIO, DEFENDANTS.

Argued October 14, 2009—Decided May 11, 2010.

Judgment of Appellate Division affirmed in part, affirmed by an equally divided court in part, and reversed in part.

Hoens, J., filed an opinion concurring in part and dissenting in part in which LaVecchia and Rivera–Soto, JJ., joined.

———

502

504

*Bruce S. Rosen* argued the cause for appellants and cross-respondents (*McCusker, Anselmi, Rosen & Carvelli,* attorneys; *Jennifer A. Borg* and *Dina L. Sforza,* of counsel; *Mr. Rosen, Kathleen A. Hirce, Katherine M. Jensen,* and *Patrice E. LeTourneau* on the briefs).

*Thomas John Salzano* argued the cause for respondent and cross-appellant pro se.

*Thomas J. Cafferty* argued the cause for amici curiae New Jersey Press Association, ABC, Inc., Advance Publications, Inc., The New York Times Company, NYP Holdings, Inc., Gannett Co., Inc., The Associated Press, Daily News, L.P., Dow Jones & Company, Inc., NBC Universal, Inc., Courthouse News Services, The Reporters Committee for Freedom of the Press, First Media, Alm Media, Inc. (soon to be known as Incisive Media, LLC), Newspaper Association of America, The American Civil Liberties Union of New Jersey, The Association of American Publishers, Inc., WPIX, Inc., and American Society of Newspaper Editors (*Scarinci Hollenbeck* and *Robinson, Wettre & Miller,* attorneys; *Donald A. Robinson,* of counsel; *Mr. Cafferty, Nomi I. Lowy,* and *Lauren E. James,* on the brief).

Justice LONG delivered the opinion of the Court.

The law of defamation is rooted in the notion that individuals should be free to enjoy their reputations unimpaired by false and defamatory attacks. In some instances, however, publications that otherwise would be actionable may escape liability because we recognize that the publisher is acting in furtherance of a socially important interest that is entitled to protection, even at the expense of uncompensated harm to a plaintiff's reputation. That protection from liability is described as a privilege. One such privilege is accorded to the publication of defamatory matter concerning another in a report of an official action or proceeding, or of a meeting open to the public that deals with a matter of public concern. That privilege, which is denominated the fair-report privilege, recognizes the value we place on the right of the

public, in a democratic society, to be informed about a wide variety of official matters. It attaches where the report is accurate and complete or a fair abridgement of the occurrence that is recounted.

This case implicates the fair-report privilege insofar as defendants published information they gleaned from a complaint filed in bankruptcy court. Plaintiff argues that the privilege does not apply to initial court pleadings because there must be some "judicial action" to trigger its protections. The lower courts were divided on that issue. We hold that the principles that inform the fair-report privilege brook no exception for initial pleadings, which fall squarely within the protective sweep of the privilege.

We are also called upon to determine the nature of the fair-report privilege and whether it is subject to defeat by proof of malice. We hold that the fair-report privilege is a hybrid. It is conditional insofar as it attaches only to full, fair, and accurate reports of government proceedings. It becomes absolute once those prerequisites are met. Fault, sufficient to defeat the privilege, occurs when the publisher fails to do what is necessary to render the report full, fair, and accurate. If the publication, in fact, satisfies that standard, the state of mind of the publisher is irrelevant.

In this case, the portion of the challenged publications that was based upon a bankruptcy complaint was full, fair, and accurate, and thus, immune from a defamation suit because of the fair-report privilege. However, because the publications also contained defamatory information derived from sources other than the complaint, plaintiff may pursue his lawsuit in connection therewith.

I.

In June 2004, NorVergence, Inc. ("NorVergence"), a telecommunications company, abruptly laid off approximately 1,300 employees and disconnected the services it provided to thousands of small businesses. On June 30, 2004, an involuntary bankruptcy

petition was filed against NorVergence. On July 14, 2004, Nor-Vergence consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code and the immediate conversion of the case to a Chapter 7 liquidation proceeding. 11 *U.S.C.* § 1112(b). On November 4, 2004, the Federal Trade Commission filed suit against NorVergence because of unfair and deceptive practices. The court entered default judgment against NorVergence and determined that NorVergence caused injury of at least $172,997,758.

Plaintiff Thomas John Salzano is the son of the former chief managing officer/consultant of NorVergence, Thomas N. Salzano, and the nephew of the chief executive officer of NorVergence, Peter J. Salzano. Plaintiff was never an employee of NorVergence.

On March 1, 2006, the trustee for the bankrupt estate of NorVergence filed a complaint against plaintiff in the United States Bankruptcy Court for the District of New Jersey, joining plaintiff as a third-party defendant in the bankruptcy proceeding. More specifically, the complaint sought, pursuant to 11 *U.S.C.* §§ 544(b), 548(a), 550(a) and *N.J.S.A.* 25:2–25(a), to avoid fraudulent transfers made to plaintiff, and to impose a constructive trust or equitable lien on the proceeds thereof.

The complaint alleged that plaintiff:

unlawfully diverted, converted and misappropriated [NorVergence]'s funds for his own personal benefit, and to the detriment of [NorVergence], by, *inter alia*, (i) applying two NorVergence checks, one in the amount of $61,200.00 dated July 1, 2003, and the other in the amount of $140,000.00 dated July 29, 2003, toward the purchase of his personal residence (the "Purchase Funds") located at 20 Argyle Street, Glen Ridge, NJ (the "Property") and (ii) by charging personal expenses, such as outings to bars and clubs, clothing and other personal expenses, between November 25, 2002 and March 24, 2004, to [NorVergence]'s American Express Business Gold/Platinum totaling $268,795.84, as well as utilizing other corporate credit cards in undisclosed amounts (the "Charges") (the Charges, together with the [ ]Purchase Funds[ ], the "Misappropriated Funds.")

[ ]The Charges were on account of expenditures that were entirely unrelated to [NorVergence]'s business. [NorVergence] transferred $268,795.84 to the AMEX Account between January 13, 2003 and April 20, 2004 in order to pay for the Charges on [plaintiff]'s behalf.

On March 2, 2006, defendant, *The Record*, published a report with the headline, "Man accused of stealing $500,000 for high living," and the subheading "NorVergence funds were taken." The report, written by defendant Martha McKay, stated in its entirety:

> The son of the mastermind behind NorVergence, a bankrupt Newark telecommunications firm, allegedly stole close to $500,000 from the company, using the money to pay for drinks, trips to area clubs and for a five-bedroom Glen Ridge house, according to court papers filed Wednesday in U.S. Bankruptcy Court in Newark.
>
> Thomas John Salzano, son of Thomas N. Salzano, the chief managing officer of bankrupt NorVergence, was accused of using two company checks—one in the amount of $61,200 dated July 1, 2003, and another for $140,000 dated July 29, 2003—to help pay for "the purchase of his personal residence located at 20 Argyle St., Glen Ridge," the papers said.
>
> The complaint, filed by U.S. Trustee Charles Forman, also alleges that Thomas John Salzano used a NorVergence corporate American Express card to charge "personal expenses, such as outings to bars and clubs, clothing and other personal expenses" unrelated to NorVergence business.
>
> The charges totaling $268,795 were made between November 25, 2002, and March 24, 2004.
>
> Neither Forman nor Salzano could be reached for comment.
>
> NorVergence's abrupt bankruptcy in July 2004[ ] threw 1,300 people out of work and left thousands of small-business customers without phone and Internet service.
>
> Legal battles raged when customers tried to get out of equipment leases that NorVergence had sold to more than 40 banks and leasing companies. In many cases, settlements have been reached, brokered by state attorneys general, providing some relief to deeply angry NorVergence customers.
>
> Last year, a U.S[.] District Court ordered a $181.7 million default judgment against NorVergence in a case brought by the Federal Trade Commission.
>
> Creditors assert the company owes $550 million.
>
> Thomas John Salzano was never an employee of NorVergence, according to court papers. His father, Thomas N. Salzano, was paid hundreds of thousands of dollars as a consultant. His uncle, Peter J. Salzano, served as CEO.
>
> Thomas John Salzano and his father started a Kenilworth business last year called Charity Snack, which also went belly-up.
>
> The complaint filed Wednesday asks that Salzano repay what he allegedly took, plus punitive damages. In addition, the papers claim that because of his "unlawful misappropriation of [NorVergence's] funds, and fraudulent transfer[s] and unjust enrichment[,]" the house at 20 Argyle St. belongs to the trustee, whose job it is to recover any and all company assets.
>
> The five-bedroom, three-bath home at 20 Argyle St. is listed for sale at $699,000, just reduced, according to a real estate Web site.

On the same date, the report was posted on the website of defendant NorthJersey.com, with the same headline but without the subheading. On March 9, 2006, the report was republished by defendant, *Glen Ridge Voice,* under the headline, "Argyle residence allegedly bought with stolen funds." It was also posted on the website of LeasingNews.org under the headline, "NorVergence BK charges Salzano son stealing $½ MM." [1]

On February 20, 2007, plaintiff filed a pro se complaint alleging defamation and associated torts against defendants North Jersey Media Group, Inc. ("NJMG"), which publishes *The Record;* Malcolm Borg, NJMG's CEO; Jonathan Markey, NJMG's president; NorthJersey.com; Stephen A. Borg, editor/publisher of *The Record* and NorthJersey.com; Martha McKay, staff reporter for *The Record* and author of the report; Glen Ridge Voice, Inc., which publishes *Glen Ridge Voice;* and Frank A. Orechio, the president of *Glen Ridge Voice* (collectively "defendants"). Plaintiff specifically contended that the following statements were false and defamatory:

1. The headline in *The Record* and on NorthJersey.com: "Man accused of stealing $500,000 for high living";

2. The subheading in *The Record:* "NorVergence funds were taken";

3. The headline in *Glen Ridge Voice:* "Argyle residence allegedly bought with stolen funds";

4. The headline on LeasingNews.org: "NorVergence BK charges Salzano son stealing $½ MM";

5. From the text of all of the reports: "The son of the mastermind behind NorVergence ... allegedly stole close to $500,000 from the company ..."; and

6. From the text of all of the reports: "Thomas John Salzano and his father started a Kenilworth business last year called Charity Snack, which also went belly-up."

Plaintiff alleged that the statements were defamatory per se in that the use of the words "stealing," "stolen funds," and "taken" imputed criminal conduct to him; that the trustee's assertions were baseless and unsupported; that defendants republished them "intentionally, maliciously, and with reckless and/or negligent dis-

---

[1] LeasingNews.org was not named as a defendant in this case.

regard of the truth"; and that defendants "knew or should have known of their falsity."

The complaint included one count of gross negligence for failure to "perform any due diligence or inquiry into the true nature of the adversarial complaint" and failure to "conduct a fair reading [of the complaint], by which a reasonable person would have determined" that the trustee neither alleged nor implied " 'stealing' of any kind." In addition, the complaint claimed invasion of privacy (public disclosure of private facts) in connection with the report's multiple allusions to plaintiff's home address, where his mother and two minor sisters live, potentially putting them at risk of retaliation from "disgruntled ex-NorVergence employees and/or former customers." The complaint further claimed invasion of privacy (false light); malice; and negligent and intentional infliction of emotional distress. Plaintiff sought presumed, consequential, compensatory, and punitive damages, as well as costs, along with a retraction.

Defendants moved to dismiss for failure to state a claim on which relief can be granted. *R.* 4:6–2(e). They argued, among other things, that their reporting was covered by the fair-report privilege, and that, in the alternative, the reports were not defamatory because they were accurate and not made maliciously.

The trial judge granted the motion and dismissed plaintiff's complaint in a rather brief opinion:

> Look, I'm going to grant the motion as—with regard to the named defendants in the motion for several reasons. One is I do not feel that the defendant—that the plaintiff's position with regard to the statements is a reasonable interpretation of that and that, in any case, the—this matter is subject to the heightened standard of malice and that there is in fact no reasonable showing of any malice. I can understand why plaintiff is upset with regard to the reporting as not being totally, 100 percent accurate. But that's not the standard we apply. And based on the arguments presented I find that this matter—that the complaint does fail to state a cause of action in defamation with regard to these particular defendants. And I so rule.

The Appellate Division reversed and remanded the case for trial. *Salzano v. N. Jersey Media Group Inc.,* 403 *N.J.Super.* 403, 958 *A.*2d 1023 (App.Div.2008). Although the panel concluded that

the report was a full, fair, and accurate report of the bankruptcy complaint, it recognized the initial pleadings exception and declared that the fair-report privilege did not apply. *Id.* at 418, 421, 958 *A.*2d 1023. The panel further ruled that the malice standard is applicable with respect to the NorVergence bankruptcy related statements because the bankruptcy was a matter of public concern. *Id.* at 422, 958 *A.*2d 1023. Finally, the panel ruled that the claim regarding the allegations that the Kenilworth business "went belly-up" should not have been dismissed. *Id.* at 425, 958 *A.*2d 1023. With respect to that claim, the Appellate Division stated that it could not determine whether the malice standard was applicable on the scant record before it and remanded for the development of a full record by the trial judge and for amendment of the complaint. *Id.* at 424–26, 958 *A.*2d 1023. Because the panel reversed the order of dismissal, it did not separately address plaintiff's remaining claims (i.e., invasion of privacy and infliction of emotional distress), except to note that "the parties may continue to pursue [those issues] in the trial court." *Id.* at 411 n. 2, 958 *A.*2d 1023.

Defendants petitioned for certification challenging the existence of the initial pleadings exception. Plaintiff cross-petitioned regarding the conclusion that the reports were full, fair, and accurate, and with respect to the application of the malice standard. We granted both petitions. 200 *N.J.* 476, 983 *A.*2d 201 (2009).

## II.

On the petition, defendants argue that there is no initial pleadings exception to the fair-report privilege; to the extent that earlier case law recognized such an exception, it has been eclipsed by modern jurisprudence; the reports in this case were full, fair, and accurate, and thus cannot serve as the basis for a defamation action; if the privilege is deemed not to insulate any or all reports at issue here, malice is the standard that plaintiff must satisfy because the reports touched on matters of public concern. Ami-

cus New Jersey Press Association is in fundamental agreement with defendants.

On the cross-petition, plaintiff argues that some judicial action must occur before the fair-report privilege operates; the initial pleadings exception is well-established and was properly applied; the reports were not full, fair, and accurate, and thus are not protected by the privilege; and because he is a private citizen he should not be held to the actual malice standard in his defamation suit.

## III.

A defamatory statement is one that is false and harms the reputation of another such that it lowers the defamed person in the estimation of the community or deters third parties from dealing with that person. *See Romaine v. Kallinger,* 109 *N.J.* 282, 289, 537 *A.*2d 284 (1988); *Restatement (Second) of Torts* (hereinafter *"Restatement"*) § 559 (1977). Defamation law generally imposes liability upon one who repeats or republishes the defamatory statements of another. *See, e.g., Lawrence v. Bauer Publ'g & Printing Ltd.,* 89 *N.J.* 451, 461, 446 *A.*2d 469, *cert. denied,* 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982); *Restatement, supra,* § 578. Indeed, earlier in our history, the common law placed "so high a premium on the protection of a person's reputation that it imposed strict liability for the publication of a defamatory statement." *Dairy Stores, Inc. v. Sentinel Publ'g Co., Inc.,* 104 *N.J.* 125, 136, 516 *A.*2d 220 (1986) (citing W.P. Keeton et al., *Prosser & Keeton on Torts* § 113 at 804 (5th ed. 1984)).

> More recently, the United States Supreme Court has declared that publishers may not be held liable for certain defamatory statements without showing that they were at least negligent. *Gertz v. Robert Welch, Inc.,* [ ] 418 *U.S.* [323,] [ ] 346–47, 94 *S.Ct.* [2997,] [ ] 3010, 41 *L.Ed.*2d [789,] [ ] 809 [1974]. That declaration is consistent with the increasing awareness of the need for public information on a wide variety of issues.
>
> Traditionally, the common law has accommodated that need by recognizing that some otherwise defamatory statements should be "privileged," i.e., that their publication does not impose liability on the publisher.
>
> [*Id.* at 136, 516 *A.*2d 220.]

In short,

> the law of defamation has undergone dramatic changes to adjust to modern times—strict liability is now gone, fault must be proven, and the falsity of a defamatory statement is no longer presumed.... Nevertheless, reputation is still valued as essential to human dignity and worth. It is not a historical relic but remains important to the unique identity of every individual in our contemporary world.
>
> [*Senna v. Florimont*, 196 *N.J.* 469, 490–91, 958 *A.*2d 427 (2008) (citation omitted).]

■ At issue here is the fair-report privilege, which protects the publication of defamatory matters that appear in a report of an official action or proceeding, or of a meeting open to the public that deals with a matter of public concern. The fair-report privilege reflects the judgment that the need, in a self-governing society, for free-flowing information about matters of public interest outweighs concerns over the uncompensated injury to a person's reputation. That public information rationale was elucidated by the United States Supreme Court:

> [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally.
>
> [*Cox Broadcasting Corp. v. Cohn*, 420 *U.S.* 469, 491–92, 95 *S.Ct.* 1029, 1044, 43 *L.Ed.*2d 328, 347 (1975).]

Part and parcel of the public information theory is that no risk should be imposed on those who bring important public information forward. *Medico v. Time, Inc.*, 643 *F.*2d 134, 142 (3d Cir.), *cert. denied*, 454 *U.S.* 836, 102 *S.Ct.* 139, 70 *L.Ed.*2d 116 (1981).

Also informing the fair-report privilege is the theory of public supervision, an analogue of the public information rationale, which Justice Holmes described as follows:

> [The privilege is justified by] the security which publicity gives for the proper administration of justice.... It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility,

and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.
[*Cowley v. Pulsifer*, 137 *Mass.* 392, 394 (1884).]

Another reason for the fair-report privilege is the so-called "agency" or "public eye" theory: "[O]ne who reports what happens in a public, official proceeding acts as an agent for persons who had a right to attend, and informs them of what they might have seen for themselves." *Medico, supra,* 643 *F*.2d at 141. In other words, if a member of the citizenry "could have witnessed the defamation, he is entitled to be made aware of it." *Id.* at 141 n. 22.

The fair-report privilege is considered to be "one of the most powerful and frequently invoked common-law defenses," Rodney A. Smolla, *Law of Defamation* § 8.67 (Thomson Reuters/West, 2d ed. 2008), and is widely recognized in judicial decisions and by statute.[2]

---

[2] The fair-report privilege has been recognized by common law or statute in at least forty-seven states and the District of Columbia. *See Ariz.Rev.Stat. Ann.* § 12–653; *Cal. Civ.Code* § 47(d), (e); *Ga.Code Ann.* § 51–5–7; *Idaho Code Ann.* § 6–713; *Ky.Rev.Stat. Ann.* § 411.060; *La.Rev.Stat. Ann.* § 14:49(1); *Mich. Comp. Laws* § 600.2911(3); *N.J.S.A.* 2A:43–1; *N.Y. Civ. Rights Law* § 74; *N.D. Cent.Code* § 14–02–05(4); *Ohio Rev.Code Ann.* § 2317.04; *Okla. Stat. Ann.* tit. 12, § 1443.1; *S.D. Codified Laws* § 20–11–5(4); *Tex. Civ. Prac. & Rem.Code Ann.* § 73.002; *Utah Code Ann.* § 45–2–3; *Wis. Stat. Ann.* § 895.05(1); *Wyo. Stat. Ann.* § 1–29–104; *Parsons v. Age–Herald Pub. Co.*, 181 *Ala.* 439, 61 *So.* 345, 348 (1913); *Green Acres Trust v. London,* 141 *Ariz.* 609, 688 *P.*2d 617, 621 (1984); *Butler v. Hearst–Argyle Television, Inc.,* 345 *Ark.* 462, 49 *S.W.*3d 116, 120 (2001); *Kurata v. L.A. News Publ'g Co.,* 4 *Cal.App.*2d 224, 40 *P.*2d 520, 522 (1935); *Meeker v. Post Printing & Publ'g Co.,* 55 *Colo.* 355, 135 *P.* 457, 458 (1913); *Burton v. Am. Lawyer Media, Inc.,* 83 *Conn.App.* 134, 847 *A.*2d 1115, 1119, *certif. denied,* 270 *Conn.* 914, 853 *A.*2d 526 (2004); *Read v. News–Journal Co.,* 474 *A.*2d 119, 121 (Del.1984); *Ortega v. Post–Newsweek Stations, Florida, Inc.,* 510 *So.*2d 972, 975 (Fla.Dist.Ct.App.), *rev. denied,* 518 *So.*2d 1277 (Fla.1987); *Shiver v. Valdosta Press,* 82 *Ga.App.* 406, 61 *S.E.*2d 221, 224–25 (1950); *Murphy v. Maui Pub. Co.,* 23 *Haw.* 804, 810 (1917); *Solaia Tech., LLC v. Specialty Publ'g Co.,* 221 *Ill.*2d 558, 304 *Ill.Dec.* 369, 852 *N.E.*2d 825, 842 (2006); *Patten v. Smith,* 172 *Ind.App.* 300, 360 *N.E.*2d 233, 236 (1977); *Flues v. New Nonpareil Co.,* 155 *Iowa* 290, 135 *N.W.* 1083, 1085 (Iowa 1912); *Gobin v. Globe Pub. Co.,* 216 *Kan.* 223, 531 *P.*2d 76, 80–81 (1975); *Paducah Newspapers, Inc. v. Bratcher,* 274 *Ky.* 220, 118 *S.W.*2d 178, 179 (1938); *Rosenberg v. Helinski,* 328 *Md.* 664, 616 *A.*2d 866,

The privilege has deep roots in New Jersey. *See, e.g., Schwarz Bros. Co. v. Evening News Publ'g Co.*, 84 *N.J.L.* 486, 496, 87 *A.* 148 (1913) (recognizing "reports of judicial proceedings are absolutely privileged, as are fair reports of debates in legislative bodies"). *See also N.J.S.A.* 2A:43–1 [3] (addressing privileged character attaching to the publication by specified press defendants of judicial and other proceedings).

The first issue here, on which the courts below were divided, is whether the privilege applies to reports regarding the contents of

872 (1992); *Sanford v. Boston Herald–Traveler Corp.*, 318 *Mass.* 156, 61 *N.E.*2d 5, 6 (1945); *Park v. Detroit Free Press Co.*, 72 *Mich.* 560, 40 *N.W.* 731, 734 (1888); *Nixon v. Dispatch Printing Co.*, 101 *Minn.* 309, 112 *N.W.* 258, 259 (1907); *Brocato v. Miss. Publishers Corp.*, 503 *So.*2d 241, 244 (Miss.1987); *Hoeflicker v. Higginsville*, 818 *S.W.*2d 650, 651 (Mo.Ct.App.1991); *Cox v. Lee Enter., Inc.*, 222 *Mont.* 527, 723 *P.*2d 238, 239–40 (1986); *Fitch v. Daily News Pub. Co.*, 116 *Neb.* 474, 217 *N.W.* 947, 948 (1928); *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 115 *Nev.* 212, 984 *P.*2d 164, 166 (1999); *Hayes v. Newspapers of New Hampshire, Inc.*, 141 *N.H.* 464, 685 *A.*2d 1237, 1238 (1996); *Costello v. Ocean County Observer*, 136 *N.J.* 594, 606, 643 *A.*2d 1012 (1994); *Henderson v. Dreyfus*, 26 *N.M.* 541, 191 *P.* 442, 452 (1919); *Campbell v. N.Y. Evening Post, Inc.*, 245 *N.Y.* 320, 157 *N.E.* 153, 155 (1927); *LaComb v. Jacksonville Daily News Co.*, 142 *N.C.App.* 511, 543 *S.E.*2d 219, 220–21, *rev. denied*, 353 *N.C.* 727, 550 *S.E.*2d 778 (2001); *McCurdy v. Hughes*, 63 *N.D.* 435, 248 *N.W.* 512, 516 (1933); *Williams v. P.W. Pub. Co.*, 140 *N.E.*2d 809, 811 (Oh.Ct.App.1957); *Wright v. Grove Sun Newspaper Co.*, 873 *P.*2d 983, 987 (Okla.1994); *Kilgore v. Koen*, 133 *Or.* 1, 288 *P.* 192, 194–95 (1930); *Weber v. Lancaster Newspapers, Inc.*, 878 *A.*2d 63, 72 (Pa.Super.Ct.2005), *appeal denied*, 591 *Pa.* 666, 916 *A.*2d 634 (2007); *Trainor v. Standard Times*, 924 *A.*2d 766, 770–71 (R.I.2007); *Lybrand v. State Co.*, 179 *S.C.* 208, 184 *S.E.* 580, 584 (1936); *Williams v. Black*, 24 *S.D.* 501, 124 *N.W.* 728, 731–32 (1910); *Langford v. Vanderbilt Univ.*, 44 *Tenn.App.* 694, 318 *S.W.*2d 568, 574 (1958); *A.H. Belo & Co. v. Lacy*, 111 *S.W.* 215, 217 (Tex.Civ.App.1908); *Lancour v. Herald & Globe Ass'n*, 111 *Vt.* 371, 17 *A.*2d 253, 258 (1941); *O'Brien v. Tribune Pub. Co.*, 7 *Wash.App.* 107, 499 *P.*2d 24, 30–31, *rev. denied*, 81 *Wash.*2d 1007 (Wash.1972), *cert. denied*, 411 *U.S.* 906, 93 *S.Ct.* 1531, 36 *L.Ed.*2d 196 (1973); *Crump v. Beckley Newspapers, Inc.*, 173 *W.Va.* 699, 320 *S.E.*2d 70, 77–78 (1983); *Ilsley v. Sentinel Co.*, 133 *Wis.* 20, 113 *N.W.* 425, 425 (1907); *Johnson v. Johnson Pub. Co.*, 271 *A.*2d 696, 698 (D.C.1970). *See also Chapin v. Knight–Ridder, Inc.*, 993 *F.*2d 1087, 1097 (4th Cir.1993) (recognizing fair report doctrine as a matter of federal law).

[3] Originally enacted by *L.* 1928, *c.* 256, § 1. The statute remains virtually unchanged since 1928.

filed pleadings in advance of any judicial action regarding those pleadings. Defendants answer that question in the affirmative and plaintiff in the negative.

Because New Jersey courts have looked to section 611 of the *Restatement* for guidance in applying the fair-report privilege, we begin our analysis there. *See Costello, supra,* 136 *N.J.* at 607, 643 *A.*2d 1012; *Darakjian v. Hanna,* 366 *N.J.Super.* 238, 245, 840 *A.*2d 959 (App.Div.2004); *Fortenbaugh v. N.J. Press, Inc.,* 317 *N.J.Super.* 439, 448–49, 722 *A.*2d 568 (App.Div.), *certif. denied,* 160 *N.J.* 91, 733 *A.*2d 496 (1999); *Orso v. Goldberg,* 284 *N.J.Super.* 446, 451–52, 665 *A.*2d 786 (App.Div.1995); *Molnar v. Star–Ledger,* 193 *N.J.Super.* 12, 20, 471 *A.*2d 1209 (App.Div.), *certif. denied,* 99 *N.J.* 162, 491 *A.*2d 674 (1984). Section 611 provides:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

[*Restatement, supra,* § 611.]

Comment e to that section, in turn, prescribes:

> [t]he publication ... of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action.

[*Restatement, supra,* § 611 comment e.]

In *Costello,* in which the fair-report privilege was deemed inapplicable because the publication was not full, fair, and accurate, we commented, in dictum, that:

> "[I]t is the prevailing view, with some few courts to the contrary, that a pleading or a deposition filed in a case but not yet acted upon may not be reported under the claim of privilege." *Prosser & Keeton on Torts, supra,* at § 115. To rule otherwise would promote the filing of lawsuits that would be promptly discontinued once the goal of public defamation or even extortion were achieved. Because the privilege does not apply to newly filed complaints, "[a] mere contemplated lawsuit not yet begun is clearly not enough" to trigger the privilege's protections. *Ibid.*

[*Costello, supra,* 136 *N.J.* at 611–12, 643 *A.*2d 1012.]

It is that dictum on which plaintiff relies for his view that we have adopted an initial pleadings exception. But in *Costello* we also said:

> Neither party, however, has raised that issue. Furthermore[,] given our holding that the fair-report privilege does not apply because the article was not a "full, fair and accurate" report, we need not resolve that thorny issue.
> [*Id.* at 612, 643 *A*.2d 1012.]

The issue in this case is the one left unresolved in *Costello:* Is an initial pleading within the protective sweep of the fair-report privilege?

In providing an answer, we note that in the early twentieth century, the initial pleadings exception was adopted in a number of jurisdictions. *See Parsons, supra,* 61 *So.* at 348; *Meeker, supra,* 135 *P.* at 458; *Murphy, supra,* 23 *Haw.* at 810–11; *Flues, supra,* 135 *N.W.* at 1085–86; *Sanford, supra,* 61 *N.E.*2d at 6; *Nixon, supra,* 112 *N.W.* at 259; *Byers v. Meridian Printing Co.,* 84 *Ohio St.* 408, 95 *N.E.* 917, 918 (1911), *superseded by statute, Ohio Rev.Code. Ann.* § 2317.05 (1953); *A.H. Belo & Co., supra,* 111 *S.W.* at 218; *Ilsley, supra,* 113 *N.W.* at 427 (reasoning that extending privilege to reports of initial pleadings that have not been brought before a court would permit protection of libelous and defamatory statements simply by filing complaint).

However, today among our sister jurisdictions, there is a clear trend away from recognizing the initial pleadings exception. Indeed, most modern court decisions have rejected that exception. *See, e.g., Bull v. LogEtronics, Inc.,* 323 *F.Supp.* 115, 135 (E.D.Va. 1971) (holding press release regarding allegations in initial pleadings privileged as fair and accurate account of issues in suit); *Johnson, supra,* 271 *A*.2d at 698 (applying fair-report privilege to publication of allegations contained in complaint for divorce); *Solaia Tech., supra,* 304 *Ill.Dec.* 369, 852 *N.E.*2d at 844 (joining "growing trend," declining to adopt initial pleadings exception); *Hoeflicker, supra,* 818 *S.W.*2d at 651–52 ("The Restatement position that a privilege does not attach for publication concerning the contents of a petition prior to any judicial action thereon has come under increasing attack."); *Cox, supra,* 723 *P.*2d at 240 (finding

"the filing of a complaint was intended to be included within the phrase 'judicial proceeding' "); *Sahara Gaming Corp., supra,* 984 *P.*2d at 168 (applying fair-report privilege to republication of complaint alleging fraud); *April v. Reflector–Herald, Inc.,* 46 *Ohio App.*3d 95, 546 *N.E.*2d 466 (1988) (applying fair-report privilege to report of EEOC complaint for age discrimination); *Weber, supra,* 878 *A.*2d at 72 ("The fair report privilege extends to court pleadings, such as a complaint.") (citing *First Lehigh Bank v. Cowen,* 700 *A.*2d 498, 502 (Pa.Super.Ct.1997) ("We find no sense to the argument that newspapers, or other media groups, cannot report on pleadings prior to judicial action without opening themselves to a libel action.")), *appeal denied,* 588 *Pa.* 759, 903 *A.*2d 539 (Pa.2006); *O'Brien, supra,* 499 *P.*2d at 30 (holding in connection with initial pleadings exception, "we think the more recent trend of the law is to the contrary").

In all, the majority of jurisdictions that have considered the issue extend the fair-report privilege to encompass initial pleadings and filings.[4] *See* Laurence H. Eldredge, *The Law of Defamation,* § 79(b)(1) (1978):

> It is perfectly clear, with respect to cases decided since 1972, that the heavy weight of authority is contrary to the earlier rule, and is that the report of pleadings filed in court which have not yet come before a judicial officer and upon which no judicial action has been taken comes within the privilege to report "judicial proceedings". The trend is strongly in this direction.
> [ (quoted in *Hanish v. Westinghouse Broad. Co.,* 487 *F.Supp.* 397, 401 (E.D.Pa. 1980)).]

The rationale for the modern approach is four-pronged according to *Solaia:*

---

[4] In addition to the cases cited above, several states have created a statutory privilege that applies to pleadings. For example, in Ohio

> [t]he publication of a fair and impartial report of the return of any indictment, the issuing of any warrant, the arrest of any person accused of crime, or the filing of any affidavit, pleading, or other document in any criminal or civil cause in any court of competent jurisdiction, or of a fair and impartial report of the contents thereof, is privileged[.]
> [*Ohio Rev.Code Ann.* § 2317.05; *accord Ky.Rev.Stat. Ann.* § 411.060; *Wyo. Stat. Ann.* § 1–29–105.]

First, the filing of a complaint is itself a public act. Second, the privilege serves the public's interest in the judicial system, and this interest begins with the filing of a complaint. Third, a judicial-action limitation on the privilege would purportedly decrease the risk of publishing scurrilous pleadings, but this limitation is ineffective: Simply because a suit has proceeded to the point where judicial action of some kind has taken place does not necessarily mean that the suit is less likely to be groundless and brought in bad faith. Fourth, the public has a sophisticated understanding of the court system and is capable of evaluating information gleaned from a complaint.

[*Solaia, supra,* 304 *Ill.Dec.* 369, 852 *N.E.*2d at 844 (internal quotation marks and citations omitted).]

In addition, it has been recognized that a suit for malicious prosecution or malicious use of process may be instituted against those who file groundless lawsuits, thus providing an aggrieved plaintiff a remedy for defamation in an initial complaint and serving as a deterrent to filing groundless lawsuits. *See, e.g., Hoeflicker, supra,* 818 *S.W.*2d at 652 (rejecting initial pleadings exception partly because suit for malicious prosecution provides remedy for filing of groundless suits). Thus, "[t]he damage resulting from use of the filing of a complaint or petition to disseminate a libel is better addressed by aggressive pursuit of sanctions against attorneys and parties who make allegations in bad faith or without support than by permitting redress against a republisher." Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 7.3.2.2.4. (PLI Press, 3d ed. 1999).

We now align ourselves with the weight of modern authority and hold that the fair-report privilege extends to defamatory statements contained in filed pleadings that have not yet come before a judicial officer. Indeed, the initial pleadings exception is at odds with the reality that the complaint is open to public view. *See R.* 1:38 (making court records public). " '[T]he presumption of openness to court proceedings requires more than a passing nod. Open access is the lens through which the public views our government institutions.' " *Verni ex rel. Burstein v. Lanzaro,* 404 *N.J.Super.* 16, 28, 960 *A.*2d 405 (App.Div.2008) (quoting *Lederman v. Prudential Life Ins. Co. of Am., Inc.,* 385 *N.J.Super.* 307, 323, 897 *A.*2d 362 (App.Div.2006)). "An open and transparent court system is an integral part of our democratic form of government.

In a democratic society, the public has a right of access not only to our courts, but also to court records." *Report of the New Jersey Supreme Court Special Committee on Public Access to Court Records* § 2.1.1 (Nov. 29, 2007). "The presumption of public access ... attaches to all materials, documents, legal memoranda and other papers 'filed' with the court that are relevant to any material issue involved in the underlying litigation ... regardless of whether the trial court relied on them in reaching its decision on the merits." *Lederman, supra,* 385 *N.J.Super.* at 316–17, 897 A.2d 362. If the initial pleadings exception is retained, an anomalous result obtains: Public documents to which the citizens of our state have free access cannot be disseminated or reported on without risk of a lawsuit.

Because it is impossible for the citizenry to monitor all of the operations of our system of justice, we rely upon the press for vital information about such matters. Members of the public simply cannot attend every single court case and cannot oversee every single paper filing, although clearly entitled to do so. Thus, it is critical for the press to be able to report fairly and accurately on every aspect of the administration of justice, including the complaint and answer, without fear of having to defend a defamation case and without the inhibitory effect of such fear.

That interpretation of the privilege more fully advances the principles informing it than any other view. Indeed, if a citizen presents himself at the local courthouse, there is no question but that he can see filed pleadings for himself. They are not sanitized nor are they filtered through a veracity lens. A full, fair, and accurate report of the contents of the pleadings, that is, what plaintiff claims and how defendant defends, places the citizen in the exact same position as if he were present on the scene. From that perspective, interposing an artificial barrier between the citizen and a truthful and accurate report of what is actually occurring makes no sense.

Likewise, the public information and supervisory rationales cannot receive full throat where the initial pleadings exception is

honored. What our citizens need to know to carry out their role in a democracy is what, in fact, has been filed in court and how the judicial system responds to it. In that context, the truth or falsity of the initial allegations and defenses is essentially unimportant to those goals. To be sure, the righteousness of the initial pleadings ultimately will need to be resolved in court, but there is no warrant for those pleadings to receive disparate treatment from the rest of the judicial process.

Another important weight in this calculus is the fact that our law provides protections for individuals against whom frivolous lawsuits are filed. Obviously malicious prosecution actions may be advanced. Further, sanctions may be imposed for frivolous pleadings. *N.J.S.A.* 2A:15–59.1. Likewise, litigants and attorneys must certify that pleadings are "not being presented for any improper purpose" under penalty of sanctions and fees. *R.* 1:4–8. In addition, the Rules of Professional Conduct prohibit an attorney from bringing or defending a proceeding "unless the lawyer knows or reasonably believes that there is a basis in law and fact for doing so that is not frivolous[.]" *RPC* 3.1.

For those reasons, the suggested policy rationale for the initial pleadings exception, explicitly stated in comment e—the fear that parties will file scurrilous complaints and then withdraw them after the damage is done—is already addressed through other means: this State's proscriptions against frivolous litigation. Moreover, as the critics of the initial pleadings exception point out, simply because "judicial action" has taken place does not mean that a suit will not turn out to be groundless. Further, given the vicissitudes of the litigation process, the formless requirement of some judicial action regarding a pleading could well preclude publication about the details of a lawsuit for months, if not years.

In short, we are convinced that the public policy underpinning of the fair-report privilege—advancement of the public's interest in the free flow of information about official actions—would be thwarted by the recognition of the initial pleadings exception. A full, fair, and accurate report regarding a public document that

marks the commencement of a judicial proceeding deserves the protection of the privilege.

We turn then to this case. At issue here is a report regarding a bankruptcy complaint. That a bankruptcy court is a part of the apparatus of the administration of justice is indisputable. Moreover, it is clear that when statements made at argument or during a plenary hearing in a bankruptcy proceeding are reported accurately, the report has the protections of the fair-report privilege. *See Price v. Walters*, 918 *P*.2d 1370, 1374–75 (Okla.1996) (applying statutory privilege to report of bankruptcy proceeding); *Restatement, supra*, § 611 comment d (stating that the privilege applies "to the report of proceedings before any court"). The filing of a bankruptcy complaint marks the commencement of that judicial proceeding. It is a public document,[5] without which the proceeding cannot occur. As such, the complaint is as much a part of the judicial process as anything that takes place after "judicial action" occurs. Thus, for the reasons that we have expressed, defendants' report of the contents of the bankruptcy complaint is subject to the application of the fair-report privilege. To the extent that the Appellate Division ruled otherwise based on the initial pleadings exception, we reverse.

## IV.

Because the application of the privilege is dependent on the fairness and accuracy of the report, we next turn to that analysis. As we have said, in order for the privilege to apply, the publication must be a "full, fair, and accurate account of the official proceeding." *Costello, supra*, 136 *N.J.* at 607, 643 *A*.2d 1012 (citing *Bock v. Plainfield Courier–News*, 45 *N.J.Super.* 302, 307, 132 *A*.2d 523 (App.Div.1957)).

---

[5] 11 *U.S.C.* § 107: "(a) Except as provided in subsections (b) and (c) of this section and subject to section 112, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." *See also Collier on Bankruptcy* § 1–107 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009).

A report that is accurate may not be edited and deleted in a way that renders its contents misleading. Fairness requires that although the report need not be exhaustive, "it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it...." [*Restatement, supra,* § 611 comment f]. Although a reporter is allowed to make factual errors and omissions, the fair-report privilege will not protect a story if the errors and omissions mislead readers.

[*Id.* at 608, 643 A.2d 1012.]

"[I]t is not necessary that [the account] be exact in every immaterial detail.... It is enough that it conveys to the persons who read it a substantially correct account of the [contents of the official document]." *Costello, supra,* 136 *N.J.* at 607, 643 *A.2d* 1012 (alterations in original) (quoting *Restatement, supra,* § 611 comment f). "A 'fair' report need not be a verbatim report; it is enough that the report be 'a rough-and-ready summary that is substantially correct.'" *Riley v. Harr,* 292 *F.*3d 282, 296 (1st Cir.2002). "Similarly, a journalist's report need not describe legal proceedings in technically precise language." *Ricci v. Venture Magazine, Inc.,* 574 *F.Supp.* 1563, 1567 (D.Mass.1983). "It is for the court to determine as a matter of law whether the report is a full, fair, and accurate account, and this determination is an objective one." *Ricciardi v. Weber,* 350 *N.J.Super.* 453, 471, 795 *A.2d* 914 (App.Div.2002) (citing *Costello, supra,* 136 *N.J.* at 607, 643 *A.2d* 1012), *certif. denied,* 175 *N.J.* 433, 815 *A.2d* 479 (2003). Courts hearing defamation claims are to apply "a common sense standard of expected lay interpretation of media reports of trials, rather than inquiring whether a report was strictly correct in defining legal charges and describing legal rulings." *Ricci, supra,* 574 *F.Supp.* at 1567.

However, we do not hesitate to intervene where real inaccuracies in the nature of distortions occur. For example, in *Costello,* we held that an article regarding the allegation of police misconduct was inaccurate due, among other things, to the use of the present verb tense in the headline and opening paragraph, which suggested that legal action was pending, when in fact, the alleged victim did not file a lawsuit. *Costello, supra,* 136 *N.J.* at 608–09, 643 *A.2d* 1012. Similarly, in *Schiavone Construction Co. v. Time,*

*Inc.*, 847 *F.*2d 1069, 1088 (3d Cir.1988), the court held inaccurate an article that reported that the plaintiff's name had been mentioned in an FBI memorandum regarding Jimmy Hoffa's disappearance, but failed to report that the memorandum also explicitly stated that the plaintiff did not appear to have any organized crime associations or to be involved in the criminal elements of the case. Likewise, accurately reporting a twenty-three-year-old charge of public corruption but failing, in the same article, to report the subsequent dismissal of the charge is not covered by the fair-report privilege. *Reilly, supra,* 176 *N.J.Super.* at 327, 423 *A.*2d 311; *see also Fortenbaugh, supra,* 317 *N.J.Super.* at 452–453, 722 *A.*2d 568 (relying on *Reilly* to hold fair-report privilege inapplicable to report inaccurately claiming professor was subject of public lewdness complaint). None of those cases is similar to what occurred here. In each, the truth was not "as broad as the defamatory imputation or 'sting' of the statement." *Lawrence, supra,* 89 *N.J.* at 460, 446 *A.*2d 469.

 Here, although the headline "NorVergence funds were taken," without any other detail, is imprecise insofar as the fact of the "taking" had not been adjudicated, the headline is not to be considered in a vacuum but must be viewed on the backdrop of the entire report. *See Costello, supra,* 136 *N.J.* at 609, 611, 643 *A.*2d 1012; *Molin v. Trentonian,* 297 *N.J.Super.* 153, 158, 687 *A.*2d 1022 (App.Div.), *certif. denied,* 152 *N.J.* 190, 704 *A.*2d 20 (1997), *cert. denied,* 525 *U.S.* 904, 119 *S.Ct.* 239, 142 *L.Ed.*2d 196 (1998). Indeed, we presume that the public reads the entire article when we assess its fairness and accuracy. Here, the article stated that it was reporting the "allegations" in the trustee's complaint and that it was the trustee who charged that plaintiff had fraudulently received NorVergence assets. The first paragraph of the report notes that the allegations were made against plaintiff in "court papers filed Wednesday in U.S. Bankruptcy Court in Newark," and other sections of the report discuss other specific details of the complaint itself. Thus, a reasonable person would understand

that the complaint alleged certain facts, but that those allegations had not yet been adjudicated.

To be sure, the report and headline used the words "stolen" and "stealing," which were not used in the complaint; however, plaintiff's contention that that made the report inaccurate is wide of the mark. In common parlance, the terms "misappropriate" and "steal" are equivalent. Indeed, "misappropriate" is actually defined as: "1a. To appropriate wrongly ... b. To appropriate dishonestly for ones own use: Embezzle." *Webster's II New College Dictionary* 717 (3rd ed. 2005). Dishonest[ly], in turn, is defined as: [t]ending to lie, cheat, or deceive. *Id.* at 332. Cheat is defined as: [f]raudulent acquisition of another's property. *Id.* at 195. Concomitantly, "steal" is defined as: "[t]o take (the property of another) without right or permission." *Id.* at 1104. Given those definitions, the allegation in the complaint that plaintiff "unlawfully misappropriated" funds belonging to NorVergence fits comfortably within the definition of "steal." Indeed, it is clear that the fair and natural meaning of the word "steal" given by reasonable persons of ordinary intelligence is "misappropriate." [6] *See Leang v. Jersey City Bd. of Educ.*, 198 *N.J.* 557, 585, 969 *A.*2d 1097 (2009) (citations omitted). Put another way, to an ordinary citizen, the "sting" of the reports was essentially the same as that of the complaint insofar as the trustee alleged that plaintiff "unlawfully diverted, converted and misappropriated" NorVergence funds "for his own personal benefit." The use of the word "steal" was simply not the kind of distortion that we have recognized as stripping a report of a public proceeding of its protections.

---

[6] Our attorney discipline cases have specifically described misappropriation as a matter in which "[t]he attorney had stolen his clients' money." *See, e.g., In re Wilson*, 81 *N.J.* 451, 456, 409 A.2d 1153 (1979). We have likewise utilized the terms "misappropriation" and "stealing" interchangeably in our ethics decisions. *See, e.g., In re Greenberg*, 155 *N.J.* 138, 149, 714 A.2d 243 (1998), *cert. denied*, 526 *U.S.* 1132, 119 *S.Ct.* 1807, 143 *L.Ed.*2d 1011 (1999).

526

Moreover, the remainder of the report clearly states that the allegations were made by the trustee in a bankruptcy complaint, and not in any sort of criminal proceeding. *Cf. Sivulich v. Howard Publ'ns, Inc.*, 126 *Ill.App.*3d 129, 81 *Ill.Dec.* 416, 466 *N.E.*2d 1218, 1220 (1984) (affirming summary judgment for defendant in defamation case where article reported "[c]harges of aggravated battery have been filed" to describe civil complaint for assault).

As the Appellate Division correctly observed, "a finer point can be put" on the trustee's allegations. However, although the publication is not a verbatim regurgitation of the complaint, it does not need to be. It is substantially correct and that is all that is required. Any other ruling based on a further mincing of the words of the publication would effectively eviscerate the privilege. In sum, we are satisfied, as was the Appellate Division, that the report of the complaint was a full, fair, and accurate one. Accordingly, it enjoys the protections of the fair-report privilege.[7]

## V.

Because the Appellate Division applied the initial pleadings exception, it did not address the issue of whether a plaintiff in a defamation action can overcome the fair-report privilege in a case, such as this, in which the publication is, in fact, full, fair, and accurate. The resolution of that issue, which must be decided because of our ruling that the privilege applies, depends to a large extent on the characterization of the fair-report privilege.

In the defamation context, privileges generally fall into one of two categories: absolute and conditional (also known as

---

[7] The existence of the privilege does not affect defendants' obligation to make right the wrong that has been done to plaintiff's reputation as a result of the publications of the false statements in the complaint. A retraction bearing a headline comparable to that used in the reports at issue and placed in a prominent position in the newspaper or website is the least that our citizens expect in these circumstances.

qualified). *Dairy Stores, supra*, 104 *N.J.* at 136, 516 *A.2d* 220; *Restatement, supra*, §§ 583 to –612. An absolute privilege is an immunity from liability which springs from society's recognition that "the need for unfettered expression is crucial to the public weal." *Dairy Stores, supra*, 104 *N.J.* at 136, 516 *A.2d* 220. Thus, the privilege is complete. *See, e.g., Hawkins v. Harris*, 141 *N.J.* 207, 213, 661 *A.2d* 284 (1995) (recognizing absolute privilege for legislative statements made in performance of legislator's duties); *Rainier's Dairies v. Raritan Valley Farms*, 19 *N.J.* 552, 558, 117 *A.2d* 889 (1955) (recognizing absolute privilege for judges, attorneys, witnesses, parties and jurors for utterances made in course of judicial proceedings).

The second class—conditional privileges—provide insulation from liability, but the insulation is not absolute; the privilege generally can be overcome by proof of malice. Conditional privileges serve to balance the individual's interests in reputation with the public's interest in the reporting of important public matters. *Dairy Stores, supra*, 104 *N.J.* at 137, 146–49, 516 *A.2d* 220 (recognizing fair comment privilege for matters of public interest), *accord Dijkstra v. Westerink*, 168 *N.J.Super.* 128, 134–36, 401 *A.2d* 1118 (App.Div.) (holding citizens have qualified privilege to make statements to authorities for prevention and detection of crime), *certif. denied*, 81 *N.J.* 329, 407 *A.2d* 1203 (1979).

Our courts have alternatively characterized the fair-report privilege as absolute, qualified, and a hybrid of the two. *Compare Schwarz Bros., supra*, 84 *N.J.L.* at 496, 87 *A.* 148 ("It is settled that the publication of fair reports of judicial proceedings are absolutely privileged"), *and Rogers v. Courier Post*, 2 *N.J.* 393, 402, 66 *A.2d* 869 (1949) ("A full, fair and accurate report of a judicial proceeding is qualifiedly privileged"), *and Orso, supra*, 284 *N.J.Super.* at 452, 665 *A.2d* 786 ("The fair-report privilege, if not an absolute privilege, is much broader than many other conditional privileges."). It seems to us that it is important to untangle that unruly skein because different classes of privilege carry with them distinct legal implications.

Several sections of the *Restatement,* on which our cases have relied (*see, e.g., Dairy Stores, supra,* 104 *N.J.* at 151, 516 *A.*2d 220; *Costello, supra,* 136 *N.J.* at 607, 643 *A.*2d 1012; *Darakjian, supra,* 366 *N.J.Super.* at 245, 840 *A.*2d 959; *Fortenbaugh, supra,* 317 *N.J.Super.* at 448–49, 722 *A.*2d 568; *Orso, supra,* 284 *N.J.Super.* at 451–52, 665 *A.*2d 786), illustrate the point. Section 599 provides that "[o]ne who publishes defamatory matter concerning another upon an occasion *giving rise to a conditional privilege* is subject to liability to the other if he abuses the privilege." *Restatement, supra,* § 599 (emphasis added). Section 600, in turn, defines abuse of the privilege as the publication of "false and defamatory matter concerning another" if the publisher "(a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity." *Restatement, supra,* § 600.[8]

However, section 600 specifically declares that it is inapplicable to the fair-report privilege. *Restatement* § 600 comment c. ("This section applies to the privileges set forth in §§ 594–598A. As indicated in § 599, comment c, the provisions of §§ 600–605A do not apply to the privileges expressed in §§ 611 and 612."). That comment recognizes that the fair-report privilege is distinct from traditional conditional privileges.

We adopted the principles of sections 599 and 600 of the *Restatement* in *Dairy Stores, supra,* 104 *N.J.* at 151, 516 *A.*2d 220, declaring that actual malice, which we denominated as "abuse of privilege," could defeat the conditional fair comment privilege. What we did not have occasion to address directly in *Dairy Stores* is the question presented here: whether the fair-report privilege is the kind of conditional privilege that is subject to defeat by actual malice.

Several of our appellate courts have reached disparate conclusions regarding that issue. In *Ricciardi,* for example, the panel held that once a court decides that a publication is full, fair, and

---

[8] That is the "actual malice" standard of *New York Times v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 707 (1964).

accurate and thus subject to the fair-report privilege, a plaintiff may nevertheless overcome the privilege by "demonstrating that the statements were published with actual malice[.]" *Supra,* 350 *N.J.Super.* at 471, 795 *A.*2d 914. Others have accepted both actual and common law malice [9] as sufficient to overcome the privilege. *See, e.g., Sedore v. Recorder Publ'g Co.,* 315 *N.J.Super.* 137, 162, 716 *A.*2d 1196 (App.Div.1998) (citing *Dairy Stores, supra,* 104 *N.J.* at 151, 516 *A.*2d 220, for proposition that actual malice defeats privilege, and *Molnar, supra,* 193 *N.J.Super.* at 21, 471 *A.*2d 1209, for proposition that common law malice defeats privilege). Still others identify the question as an unresolved one subject to vigorous debate among our courts. *See, e.g., Fortenbaugh, supra,* 317 *N.J.Super.* at 452, 722 *A.*2d 568 (stating "the kind of malice needed to defeat the fair-report privilege is . . . unsettled in New Jersey"); *Orso, supra,* 284 *N.J.Super.* at 455–56, 665 *A.*2d 786 (recognizing open question regarding whether fair-report privilege can be overcome by malice in light of holding in *Dairy Stores* "that knowledge of falsity or reckless disregard will defeat a qualified privilege, and the court's reference to § 600 of the *Restatement,* which, as previously discussed, excepts the fair-report privilege from the rest of the qualified privileges").

That same gap exists in *Costello,* which, in dictum, suggested that the fair-report privilege may be defeated by malice. *Supra,* 136 *N.J.* at 607, 643 *A.*2d 1012. In spite of that statement, *Costello* cited the *Restatement* section 611, which is plainly contrary. Indeed, comment a to section 611 provides:

> a. Character of privilege. The privilege of the publication of reports of defamatory statements covered in this Section is not an absolute privilege. It is, however, somewhat broader in its scope than the conditional privileges covered in §§ 594 to 598A. The basis of this privilege is the interest of the public in having

---

[9] Common law malice (also referred to as "malice in fact") is publication made with "spite, ill will, or a purpose to harm." Sack, *supra,* § 7.3.2.2.1. That was the standard in *Restatement of Torts* section 611 (1938), which declared the privilege lost if the publication is "made solely for the purpose of causing harm to the person defamed." That standard was eliminated in the present version. *Lavin v. New York News, Inc.,* 757 *F.*2d 1416, 1421 (3d Cir.1985).

information made available to it as to what occurs in official proceedings and public meetings. The privilege is therefore one of general publication and is not limited to publication to any person or group of persons. For the same reason the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false. Abuse of the privilege takes place, therefore, when the publisher does not give a fair and accurate report of the proceeding. (On this see Comment f).

That is our view as well. To us, the fair-report privilege is neither fish nor fowl—that is, it is neither purely absolute nor purely conditional. Rather, it is a hybrid; it is conditional insofar as it cannot attach unless the report is full, fair, and accurate. Once that condition is met, the privilege becomes absolute and cannot be defeated. The publisher's failure to do what is necessary to make the report full, fair, and accurate is the only relevant inquiry. *See, e.g., Green Acres Trust, supra,* 141 *Ariz.* 609, 688 *P.*2d 617; *Ortega, supra,* 510 *So.*2d 972; *Jones v. Taibbi,* 400 *Mass.* 786, 512 *N.E.*2d 260 (1987). Indeed, it is that failure that satisfies the fault standard imposed by the United States Supreme Court in *Gertz, supra,* 418 *U.S.* at 347–48, 94 *S.Ct.* at 3010–11, 41 *L.Ed.*2d at 809–10 (holding publishers generally not liable for defamatory statements in absence of negligence).

That is the view of most scholars as well. *See, e.g.,* Sack, *supra,* § 7.3.2.2.1; David Marburger, Note, *More Protection for the Press: The Third Circuit Expands the Fair Report Privilege,* 43 *U. Pitt. L.Rev.* 1143, 1160 (1982). They consider the fair-report privilege as different from other conditional privileges and conclude that it is lost only by a "showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement." *Restatement, supra,* § 611 comment b. As long as the report is fair and accurate, "both the publication's truth and the publisher's knowledge of its truth or motivation for publishing it are irrelevant." Sack, *supra,* § 7.3.2.2.1. "Under this 'modern' trend of the law, the accurate reporting of judicial proceedings results in complete immunity," regardless of the knowledge or motive of the publisher. *Read, supra,* 474 *A.*2d at 121 (citing *Boston Mut. Life Ins. v. Varone,* 303 *F.*2d 155 (1st Cir.1962)); *see also Pittman v. Gannett River States*

*Publ'g Corp.*, 836 *F.Supp.* 377, 384 (S.D.Miss.1993); *Metcalf v. KFOR–TV, Inc.*, 828 *F.Supp.* 1515, 1526 (W.D.Okla.1992); *Ricci, supra*, 574 *F.Supp.* at 1567; *Green Acres Trust, supra*, 688 *P.*2d at 626; *Butler, supra*, 49 *S.W.*3d at 120; *Ortega, supra*, 510 *So.*2d at 975–76; *Lawton v. Ga. Television Co.*, 216 *Ga.App.* 768, 456 *S.E.*2d 274, 277 (1995); *Solaia Tech., supra*, 304 *Ill.Dec.* 369, 852 *N.E.*2d at 843; *Butcher v. S.E.M. Newspapers, Inc.*, 190 *Mich. App.* 309, 475 *N.W.*2d 380, 382, *appeal denied*, 439 *Mich.* 889, 478 *N.W.*2d 169 (1991); *Moreno v. Crookston Times Printing Co.*, 610 *N.W.*2d 321, 333 (Minn.2000); *Furgason v. Clausen*, 109 *N.M.* 331, 785 *P.*2d 242, 245 (1989); *Freeze Right Refrigeration and Air Conditioning Servs., Inc. v. City of New York*, 101 *A.D.*2d 175, 475 *N.Y.S.*2d 383, 388–89 (1984); *Wright, supra*, 873 *P.*2d 983 (holding fair and accurate/true/honest report absolutely privileged). *But see Stem v. Gannett Satellite Info. Network*, 866 *F.Supp.* 355, 360 (W.D.Tenn.1994) (holding actual malice defeats the privilege).

Our conclusion to adopt the modern view is informed by the uniqueness of the fair-report privilege, which derives from the official nature and public concern over what is being reported. An accurate record of those proceedings is the very information a citizen needs to carry out his role in a democracy as supervisor of the government, and indeed is what he could obtain if he miraculously were capable of attending every single public proceeding every single day. Conveying to the citizenry what has really been said or done in a public or judicial forum is the value that the fair-report privilege was intended to protect. Indeed as one scholar has noted:

> The interests served by a report privilege could not be protected adequately if the publisher's view of the validity of the statement reported were allowed to form the basis of civil liability. With respect to reports of public, official statements and proceedings, the public's supervisory rights over government require that the people have as full a view as possible of the conduct of public officials and the rules and policies that govern the conduct of public affairs. A rule requiring deletion of material from reports of governmental proceedings based on the view of the reporter about the falsity of the statements made in the course of those proceedings would deny the people access to full reports of the operations of government. [Kathryn D. Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report*, 54 *N.Y.U. L.Rev.* 469, 541–42 (1979).]

Once that is understood, it is clear that so long as the publisher fully, fairly, and accurately reports the contents of a public proceeding, he has done what is necessary and is immune from a suit for defamation based on false statements made, not by him, but by the participants in the proceeding. Although the truth or falsity of the information reported on may later be established, it is not the focus of the fair-report privilege. Rather, fair report is intended to increase the flow of public information about what is truly happening in our public and quasi-public institutions, no more and no less. Thus, it is satisfied where the publisher fully, fairly, and accurately reports on what is in the proceedings, including pleadings. *See* Marburger, *supra*, 43 *U. Pitt. L.Rev.* at 1160. That said, plaintiff in this case may not advance a challenge based on malice to the privileged report of the bankruptcy complaint, which we have declared to be full, fair, and accurate.

## VI.

We have thus far focused solely on the statements based on the bankruptcy complaint to the effect that plaintiff "stole money" from NorVergence. However, that is not the only claim advanced by plaintiff, who also contends that he was defamed by the reports asserting that he and his father "started a Kenilworth business last year called Charity Snack which also went belly-up." Because that statement, which at least impliedly suggests a lack of business skill, was not derived from the bankruptcy complaint, it is not insulated by the fair-report privilege.

Thus, plaintiff may proceed with his suit based on that issue. That said, the question that arises is what burden plaintiff bears in proving his defamation case in respect of that claim. Plaintiff argues in his cross-petition that because he is a private individual who has not placed himself in the eye of a public controversy, the Appellate Division erred in applying the actual malice standard to him. To be sure, the actual malice standard can, in proper circumstances, apply to a private citizen. *See Sisler*

*v. Gannett Co.*, 104 *N.J.* 256, 279, 516 *A.*2d 1083 (1986) (applying actual malice standard to private citizen involved in regulated industry who should have been aware that his actions implicated matters of public concern and bore "attendant risk of publicity"). In determining what constitutes speech involving a matter of public concern, we apply the "content, form and context" standard of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 *U.S.* 749, 761, 105 *S.Ct.* 2939, 2946, 86 *L.Ed.*2d 593, 604 (1985) (citation omitted) and consider, as well, "the identity of the speaker and the targeted audience." *Senna, supra,* 196 *N.J.* at 492–93, 958 *A.*2d 427 (citing *Dun & Bradstreet, supra,* 472 *U.S.* at 761–63, 105 *S.Ct.* at 2947, 86 *L.Ed.*2d at 604–05). Where the speaker is disinterested, as is generally the case with the media, enhanced protections inhere if the publication touches on matters of public concern. *Id.* at 495, 958 *A.*2d 427.

In this case we need not perseverate further over the issue of what standard applies because, as the Appellate Division declared, the record regarding Charity Snack is an inadequate vehicle for such a determination: "We lastly observe that because the matter has not been the subject of discussion in the trial court, it is not presently appropriate to ascertain whether the actual malice standard should apply to this aspect of the claim." *Salzano, supra,* 403 *N.J.Super.* at 426, 958 *A.*2d 1023. We think the panel was correct in recognizing the paucity of the record regarding the failure of the Kenilworth business and in remanding the issue to the trial judge "to be more fully developed." *Ibid.* In that proceeding the trial judge should apply the standard set out in *Senna* and may address any other issues raised by either party specific to the Charity Snack claim.

## VII.

The judgment of the Appellate Division is affirmed in part and reversed in part. We affirm the Appellate Division's decision to permit plaintiff's case to proceed based on the Charity Snack allegation. We reverse the Appellate Division's conclusion that

the initial pleadings exception to the fair-report privilege insulated the report of the NorVergence bankruptcy complaint from dismissal. The members of the Court being equally divided on the fairness and accuracy of the report of the NorVergence bankruptcy complaint, the Appellate Division's holding that the report was full, fair, and accurate is affirmed.

Justices ALBIN and WALLACE join in Justice LONG's opinion. Justice HOENS filed a separate opinion, concurring in part and dissenting in part, in which Justices LaVECCHIA and RIVERA–SOTO join. Chief Justice RABNER did not participate.

Justice HOENS, concurring in part and dissenting in part.

I concur in the majority's conclusion that the time has come for us to reject the initial pleadings exception to the fair reporting privilege and I concur in the majority's persuasive and thorough explanation of why that exception has no place in our jurisprudence. Moreover, I concur in the majority's conclusion that once it has been determined that the fair reporting privilege applies, it becomes an absolute, rather than a qualified one.

I dissent, however, from the majority's analysis of the application of the fair reporting privilege in this case because I cannot agree with the majority's conclusion that the news articles that are the focus of this litigation meet the test of "full, fair and accurate." Instead, in my view, those news reports fall short of the standard that we have traditionally applied, with the result that they should not be cloaked in the protection that the privilege affords.

Much of the majority's approach to the meaning of "full, fair and accurate" is not subject to serious debate. Its reliance, for example, on this Court's opinion in *Costello v. Ocean County Observer*, 136 *N.J.* 594, 607–09, 643 *A.*2d 1012 (1994), including that decision's references to the *Restatement* test, *see Restatement (Second) of Torts* § 611 comment f (1976) (describing accuracy and fairness requirements of fair reporting privilege), *ante* at 522–24, 993 *A.*2d at 791–93, is hardly controversial. But in explaining the meaning of the "full, fair and accurate" articulation of the standard

that serves as the yardstick against which the privilege-worthiness of a news report will be measured, and in applying that test in this matter, the majority has overlooked the significant shortcomings of these news reports.

Longstanding decisions of this Court, together with opinions on the question that have been published by our appellate courts, and by the federal and other state courts, identify a series of fundamental and widely accepted principles that inform courts in their decisions about whether a particular news report will be privileged. We do not demand that a report be "exact in every immaterial detail," but instead require that it be "a substantially correct account." *Costello, supra,* 136 *N.J.* at 607, 643 *A.*2d 1012 (quoting *Restatement (Second) of Torts, supra,* § 611 comment f); *see also Orso v. Goldberg,* 284 *N.J.Super.* 446, 454, 665 *A.*2d 786 (App.Div.1995) (concluding privilege will apply to news report that conveys "a substantially correct account," even if it is not "exact in every detail").

We have not required, therefore, that a news report merely reprint the words of a complaint filed in court, or that it only quote verbatim what has been said in a public forum; we have recognized that some inaccuracies may be reported without loss of the privilege. In those circumstances, the threshold question is whether the factual inaccuracy is significant or substantial, because if it is not, the mere fact of an inaccuracy will not void the privilege. Thus, for example, a news article that referred to a particular court order as the source of information, although inaccurate, was deemed to be of no consequence because the information came from a different document contained in the same court file. *Sedore v. Recorder Publ'g Co.,* 315 *N.J.Super.* 137, 159, 716 *A.*2d 1196 (App.Div.1998). Similarly, a news report that takes care to present both sides of a story will find refuge within the protective scope of the privilege, in spite of including some otherwise objectionable language. *Orso, supra,* 284 *N.J.Super.* at 455, 665 *A.*2d 786.

Nonetheless, this Court has been careful to make it clear that the privilege is not a license for sensationalizing and does not authorize or protect false or misleading reports. *See Costello, supra,* 136 *N.J.* at 609–10, 643 *A.*2d 1012. That is, the article may not be edited or have information deleted in such a way as to become misleading, and factual omissions or facts that are "misplaced" so as to "convey an erroneous impression" to the reader will not meet the test of fairness. *Id.* at 608, 643 *A.*2d 1012 (quoting *Restatement (Second) of Torts, supra,* § 611 comment f). As a result, if a publication creates false innuendo from the facts as they are reported, *see Romaine v. Kallinger,* 109 *N.J.* 282, 293, 537 *A.*2d 284 (1988) (assessing fair inference to be drawn from larger context of book chapter), or if a news account of a trial court proceeding is written so as to hold up a person to ridicule, *Bock v. Plainfield Courier–News,* 45 *N.J.Super.* 302, 309–10, 132 *A.*2d 523 (App.Div.1957), or if it includes "distorted accounts" of what occurred, *id.* at 307, 132 *A.*2d 523, or if old allegations that have already been discredited are presented as if they are still current and unresolved, *Fortenbaugh v. N.J. Press, Inc.,* 317 *N.J.Super.* 439, 449–51, 722 *A.*2d 568 (App.Div.), *certif. denied,* 160 *N.J.* 91, 733 *A.*2d 496 (1999); *Reilly v. Gillen,* 176 *N.J.Super.* 321, 327, 423 *A.*2d 311 (App.Div.1980), the report will not meet the test of "full, fair and accurate" needed to invoke the protection of the privilege.

Our view, and that of our Appellate Division, is squarely in accord with the analytical framework used by the federal courts as well as the courts in our sister states. Minor variations in wording, as between an arrest report and the news account, will not vitiate the privilege, *see Hegwood v. Cmty. First Holdings, Inc.,* 546 *F.Supp.*2d 363, 367 (S.D.Miss.2008); *Pittman v. Gannett River States Publ'g Corp.,* 836 *F.Supp.* 377, 384 (S.D.Miss.1993), but distortions or use of facts that have been rearranged to create false impressions will, *see Lawton v. Ga. Television Co.,* 216 *Ga.App.* 768, 456 *S.E.*2d 274, 277 (1995).

Applying these principles, the minor inaccuracies in the news reports before this Court relating to the specific sum sought to be returned to the bankrupt estate by the Trustee, although factually erroneous, are too inconsequential to matter. That is, referring to the sum in issue as $500,000 or even as "$½ MM" when the true amount was $469,995.84, is the kind of minor deviation from precise factual accuracy that would not render the account inaccurate in the sense required for loss of the privilege. Similarly, including a reference to plaintiff's father as the "mastermind behind NorVergence," although apparently not derived directly from the Trustee's complaint, would not suffice to take the news accounts outside of the privilege. Were those the only deviations from the court filing by the Trustee, I would join my colleagues in their analysis and in their conclusion that the news reports were "full, fair and accurate." However, those are not the only inaccuracies in these news reports.

Rather, the real inaccuracy, and one that in my view takes the news accounts outside of the privilege, lies in the use of variations of the verb "steal" both in the headlines and in the body of the reports. Analyzing that word choice requires consideration of the role that headlines play in the "full, fair and accurate" framework, as well as the precision with which legal terms must be utilized by news reporters. More to the point, it requires us to consider the overarching question of how we determine whether the "sting" of the news report matches the "sting" of the truth. *See, e.g., Lawrence v. Bauer Publ'g & Printing*, 89 *N.J.* 451, 460, 446 *A.*2d 469 (holding that in defamation action, defense of truth requires that truth be "as broad as the defamatory imputation or 'sting' of the statement"), *cert. denied*, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982).

Headlines, in general, present unique challenges in the determination of whether a news report is "full, fair and accurate." We have commented on the impact that a misleading headline has on the "full, fair and accurate" analysis because of its capacity to create a focus for the article that may be misleading. *See*

*Costello, supra,* 136 *N.J.* at 609–10, 643 *A.2d* 1012. Even though headlines surely have the capacity to create a greater impact on the reader, however, a news account should be considered as a whole. *See Molin v. Trentonian,* 297 *N.J.Super.* 153, 157, 687 *A.2d* 1022 (App.Div.) (noting that majority of jurisdictions support rule that headlines "be construed in conjunction with their accompanying articles"), *certif. denied,* 152 *N.J.* 190, 704 *A.2d* 20 (1997), *cert. denied,* 525 *U.S.* 904, 119 *S.Ct.* 239, 142 *L.Ed.2d* 196 (1998). As a result, if the only objectionable implication flows from the few words chosen for large print headlines, the privilege will still apply. *Ibid.* Similarly, if the inaccuracy created by the headline is immediately corrected in the opening sentence of the report itself, the news report, when evaluated as a whole, may be entitled to be protected by the privilege. *See McGhee v. Newspaper Holdings, Inc.,* 115 *P.*3d 896, 898–99 (Okla.Civ.App.2005).

News reports that utilize legal terminology, likewise, have been accorded separate evaluation. The majority, for example, relies on a pair of federal court decisions as part of analyzing the role to be played by a news report's use of legal terms. *Ante* at 523–24, 993 *A.2d* at 792–93; *see Riley v. Harr,* 292 *F.*3d 282, 296 (1st Cir.2002) (utilizing "rough-and-ready summary" standard to evaluate fairness); *Ricci v. Venture Magazine, Inc.,* 574 *F.Supp.* 1563, 1567 (D.Mass.1983) (concluding that journalists need not utilize "technically precise language" in describing courtroom proceedings; applying "common sense standard of expected lay interpretation of media reports of trials").

Although we have not previously so held, other courts have concluded that the use of technically inaccurate legal terms will not support relief, as long as the report itself remains full, fair and accurate. *See, e.g., Orr v. Argus–Press Co.,* 586 *F.*2d 1108, 1112–13 (6th Cir.1978) (concluding that terms "swindle" and "phony" used to describe facts asserted in SEC complaint were "ill chosen" but that other factual descriptions undermined false inferences), *cert. denied,* 440 *U.S.* 960, 99 *S.Ct.* 1502, 59 *L.Ed.2d* 773 (1979); *Lambert v. Providence Journal Co.,* 508 *F.*2d 656, 658–59 (1st Cir.)

(applying Rhode Island law; concluding that describing killing as murder was not misleading), *cert. denied,* 423 *U.S.* 828, 96 *S.Ct.* 45, 46 *L.Ed.*2d 45 (1975); *Koniak v. Heritage Newspapers Inc.,* 198 *Mich.App.* 577, 499 *N.W.*2d 346, 348–49 (rejecting claim based on description of nolo contendere plea as "willing to accept the consequences of the conviction"), *appeal denied,* 444 *Mich.* 856, 508 *N.W.*2d 500 (1993).

The test to be applied in the evaluation of whether a news report is "full, fair and accurate" uses common sense and objective terms, asking whether the "sting" of the report matches that of the event or the pleading being reported upon. *See Lawrence, supra,* 89 *N.J.* at 460, 446 *A.*2d 469. Other courts have explained the meaning of this test to be whether the report "produces the same effect on the mind of the recipient which the precise truth would have produced." *Yohe v. Nugent,* 321 *F.*3d 35, 43 (1st Cir.2003) (applying Massachusetts law; quoting *ELM Med. Lab., Inc. v. RKO Gen., Inc.,* 403 *Mass.* 779, 532 *N.E.*2d 675, 678 (1989)).

In engaging in this evaluation, however, courts have focused on what it was about the truth that produced a "sting" and have compared that to the effect produced by the challenged news account. Thus, for example, a news report that inaccurately referred to a defendant being accused of thirty to fifty acts of sexual assault on a family member, in place of the eight identified in the charging instrument, was privileged. *Koniak, supra,* 499 *N.W.*2d at 348. Although plainly inaccurate, the Michigan court pointed out that "the sting" arising from the charge of sexual assault was the same, "whether plaintiff assaulted his stepdaughter once, eight times, or thirty times." *Ibid.* Similarly, where a news report revealed that its subject had been convicted of homicide, had served four years, and was now employed as a school bus driver, the fact that she had only served two years was irrelevant. *Woodard v. Sunbeam Television Corp.,* 616 *So.*2d 501, 503 (Fla.Dist.Ct.App.1993). The article's "sting" arose from the fact that someone who had been convicted of a homicide was working with children in the community; the length of the sen-

tence served was immaterial when evaluating the "stinging" effect that the truth would have had. *Ibid.*

As part of the basis for its conclusion that the news articles in this appeal were sufficiently "full, fair and accurate" to merit protection, the majority relies on dictionary definitions of the word "steal" as support for the common sense understanding of the articles and the "sting" that they inflicted as compared to the truth. *Ante* at 525–26, 993 *A*.2d at 793–94. But that approach actually misses the point, because even the definitions quoted demonstrate that the "sting" of that word choice is far harsher than the truth, and that choosing that value-laden word, in the end, created a news report that was both unfair and inaccurate.

The definitions of the word "steal" that are used by the majority each carry clearly pejorative implications of a criminal act, *ante* at 525, 993 *A*.2d at 793. Numerous other definitions of the word "steal" also explain that the word conveys a strongly negative message. "Steal, like misappropriate, is generally a broader term than embezzle; it has the same meaning as misappropriate, but much stronger negative connotations." *A Dictionary of Modern Legal Usage* 311 (2d ed. 2001) (emphasis omitted). "Steal [is defined to mean]: 1. To take (personal property) illegally with the intent to keep it unlawfully." *Black's Law Dictionary* 1453 (8th ed. 2004). To steal, when used as a verb, means "to take and carry away feloniously and usu[ally] unobserved: take or appropriate without right or leave and with intent to keep or make use of wrongfully." *Webster's Third New International Dictionary* 2232 (1976). Each of these definitions, therefore, carries with it the clear connotation of a crime, together with its attendant evil-minded mens rea. None of that is faithful to the actual allegations made in the Bankruptcy Court by the Trustee.

In traditional defamation law, attributing a criminal act to someone is slander per se, *see Romaine, supra,* 109 *N.J.* at 291, 537 *A*.2d 284 ("Certain kinds of statements ... are considered defamatory as a matter of law. A prime example is the false

attribution of criminality."), and innuendo that insinuates guilt of wrongdoing will not be protected as fair, *see Fortenbaugh, supra,* 317 *N.J.Super.* at 451, 722 *A.*2d 568 (citing *Reilly, supra,* 176 *N.J.Super.* at 327, 423 *A.*2d 311). Historically, false accusations of a crime or false insinuations that one has committed a criminal act are considered to be different from other defamatory statements. At common law, for example, it was well established that such statements were actionable without proof of special damages, because they were regarded to be slander per se. *Gnapinsky v. Goldyn,* 23 *N.J.* 243, 250, 128 *A.*2d 697 (1957); *Johnson v. Shields,* 25 *N.J.L.* 116, 118–19 (1855).

Although we have, in another context, noted that some legal scholars have voiced criticism in general of the slander per se rule, *see, e.g., Ward v. Zelikovsky,* 136 *N.J.* 516, 541, 643 *A.*2d 972 (1994), it retains vitality, including, in particular, as it relates to the false imputation of a criminal act. *See, e.g., Jobes v. Evangelista,* 369 *N.J.Super.* 384, 397, 849 *A.*2d 186 (App.Div.) (concluding charge to jury on presumed damages was appropriate based on falsely-filed criminal charges), *certif. denied,* 180 *N.J.* 457, 852 *A.*2d 193 (2004); *Ricciardi v. Weber,* 350 *N.J.Super.* 453, 475–76, 795 *A.*2d 914 (App.Div.2002) (stating rule; concluding that accusation of sexual harassment was not imputation of criminal act required for slander per se), *certif. denied,* 175 *N.J.* 433, 815 *A.*2d 479 (2003); *Biondi v. Nassimos,* 300 *N.J.Super.* 148, 156–57, 692 *A.*2d 103 (App.Div.1997) (adopting strict definition of criminal offense capable of constituting slander per se; relying on definition contained in *Restatement (Second) of Torts* § 571 comment c (1977)).

This long common law history demonstrates that some false accusations, including false accusations of a crime, are so obviously damaging to one's reputation that no proof of special damages is required in order for an award to be appropriate. Words of that type carry unique and plainly pejorative connotations entitling their target to relief simply because they have been uttered. By implication, therefore, words like that convey a special sting,

making them worthy of our careful scrutiny if we are to agree that they nonetheless will be cloaked in privilege.

Because in common understanding the word "steal" describes a criminal act, the headline and the opening sentence conveyed, unmistakably, the message that the subject of the story was being prosecuted for a crime. That, in turn, surely conjured up in the mind of any objective and reasonable reader the mental image of the now all-too-familiar "perp walk" on the evening news that is sure to follow. Joining that image with an entirely accurate reference to the United States Trustee compounds rather than blunts the unfair message, for it brings to mind visions of the awesome power of the Federal Government as the accuser with all that that entails. *See, e.g., Schiavone Constr. Co. v. Time, Inc.,* 847 *F.*2d 1069, 1088 (3d Cir.1988) (concluding that deletion of exculpatory language from report while "thrust of the story" remained intact enhanced potential for unfairness and distortion).

Polite parsing of the legal nuances as between stealing and a civil complaint charging that one has diverted assets of a bankrupt estate cannot overcome the reality that the choice of the word "steal" inflicts a far greater sting. To regard that as full, fair and accurate and to cloak it with absolute immunity rewards a choice made to sensationalize stories rather than report them.

Whether we see news reporters as the eyes of the public or as our agents on the scene, that is, as surrogates who see events or read documents in our place, *see Costello, supra,* 136 *N.J.* at 607, 643 *A.*2d 1012 (quoting *Prosser and Keeton on Torts* § 115 (5th ed. 1984)), and whether we regard the fair reporting privilege as being supported by the alternative rationales of "public supervision" or serving the public's interest in being informed, *see Sedore, supra,* 315 *N.J.Super.* at 152, 716 *A.*2d 1196 (quoting *Medico v. Time, Inc.,* 643 *F.*2d 134, 141–42 (3d Cir.), *cert. denied,* 454 *U.S.* 836, 102 *S.Ct.* 139, 70 *L.Ed.*2d 116 (1981)), in the end, the news report simply calls matters to the attention of a wider audience of people who would otherwise have been privileged to hear or see them first-hand. We therefore protect the press from the threat of suit that would otherwise be permissible for a republication of a

slanderous statement. For me, however, part and parcel of the privilege must be that the news entity acts as a neutral filter of the information, reporting it as blandly or as harshly as it would appear to us had we read, heard, or seen it ourselves. That is not to imply that the fair reporting privilege does or should require a mere parroting or duplication of information, but that the report, as a whole, is full, fair and accurate.

The privilege itself has roots not only in the First Amendment freedom of the press and our cherished ideals relating to a fully informed public, but, in modern times, has strong ties to our desire to foster openness and transparency in all aspects of our government. But the price to be paid for that shield of immunity must be our insistence that news organizations faithfully, carefully, and accurately perform their role and that they find no refuge in the privilege when the words that they have chosen inflict a greater sting than the truth.

This news story has all of the elements that cry out for this Court to pull aside the cloak of privilege, for it misleads by innuendo, insinuates criminal prosecutions are afoot, and implies by distortion. It does not qualify as a news report that is full, fair and accurate and I therefore cannot agree that it is worthy of the protection that follows the invocation of an absolute privilege. Rather, I would reverse the Appellate Division's conclusion that the news reports were full, fair and accurate and would conclude instead that, in their entirety, the news reports fall outside the protective scope of the privilege. I would therefore expand the remand ordered by the majority as a remedy for the assertions relating to plaintiff's other business, Charity Snack, to include the news reports as a whole.

Justices LaVECCHIA and RIVERA–SOTO join in this opinion.

*For affirmance in part/reversal in part*—Justices LONG, ALBIN and WALLACE—3.

*For concurrence in part/reversal in part*—Justices LaVECCHIA, RIVERA–SOTO and HOENS—3.